NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TOMCO COMMUNICATIONS, INC., Respondent.

No. 76–2178.

United States Court of Appeals, Ninth Circuit.

Jan. 16, 1978.

Elinor Hadley Stillman (argued), Washington, D. C., for petitioner.

Norman H. Kirshman (argued), Los Angeles, Cal., for respondent.

Before BARNES and TRASK, Circuit Judges, and BURNS,* District Judge.

BURNS, District Judge.

In this application for enforcement, the National Labor Relations Board (the Board) represents the charging party, the United Electrical, Radio, and Machine Workers of America, Local 1412 (the Union), against Tomco Communications, Inc. (the Company).

The Board found that the Company had violated § 8(a)(5) and (1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(5) and (1), by failing to bargain in good faith; and § 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by locking out Union members to enhance its unlawful bargaining position and to discourage their support of the Union.

Pursuant to these findings, the Board ordered the Company to cease and desist from discouraging membership in the Union by locking out employees in support of an unlawful bargaining position, to bargain collectively, to offer reinstatement and reimbursement for consequential loss of wages suffered by the locked out employees, and to post notices and preserve evidence of compliance. The Board's decision is reported at 220 N.L.R.B. 636, 90 L.R.R.M. 1321 (1975).

We have jurisdiction to consider the Board's application under § 10(e) of the Act, 29 U.S.C. § 160(e). We deny enforcement.

## FACTS

The Company is a manufacturer of electronic components in Mountain View, California. On November 2, 1973, following a Board-conducted election, the Union was certified as the collective bargaining representative of the Company's nine production and maintenance employees.

Beginning on November 9, 1973, the Company and the Union met in negotiations for a collective bargaining agreement. The Company was represented principally by Charles Goldstein, an attorney in a law firm it had retained, the Union by Paul Chown, an international representative of the Union. It was agreed that the negotiators would indicate any accords reached by initialling the appropriate draft provision, but that the entire contract would not become effective until ratified by the Union's membership and Company directors.

The Union submitted a proposed contract for discussion. No agreement was reached on any of its 25 articles. However, Goldstein did set forth the Company's responsive position on each proposal. He also recommended that bargaining on economic issues generally be deferred until the next meeting, when he promised to return with a management counter-proposal. This Company draft became the basis of negotiations at all subsequent meetings.

Chown and Goldstein met again on December 5 and 6. On the first day they

---

* Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation.

discussed the Company's proposed draft and reached tentative agreement on six items—discharges (in which the Company gave up incorporation of a list of specific acts to be deemed just cause); bulletin boards (in which the Union agreed to a requirement that Union notices be approved by management); seniority; recognition; non-discrimination; and military leave. Further discussions, but no further agreements, took place on December 6.

By the end of this second session, the parties had sufficiently disclosed their positions to reveal the major issues on which they never agreed. Goldstein indicated that the Union was "shooting very high" in its demand for wage increases of between 85 cents and $1.05 an hour, and doubted the Company's willingness to continue with 12 days of annual sick leave when it believed the current allowance was being abused. He opposed the Union's demand for security in the form of a union shop. He opposed inclusion of a clause continuing past practices, suggesting that each "practice" be dealt with individually instead and that the Union furnish a list of the existing benefits it had in mind. He indicated that a requested dues check-off might be acceptable, provided the Company were indemnified for erroneous deductions (a concept that Chown said was "new" to him). Finally, he objected to the Union's proposed grievance procedure, involving shop stewards who would have unlimited freedom to investigate and process grievances. The Union, for its part, had resisted a no-strike clause which Goldstein demanded in return for a management consent to submit disputes to arbitration.

The next meeting took place on December 14. Chown submitted a revised proposal on four subjects—seniority, grievance processing, representation, and management rights. Goldstein offered to accept the Union's grievance procedure [1] if the Union would accept the Company's manage-

ment rights and no-strike clauses. This offer was rejected. Wages and Union Security were again discussed, but the parties did not succeed in narrowing their differences.

Negotiations resumed on January 7 and 8, 1974, now in the presence of a state conciliator. The parties agreed to an additional fourteen provisions, including those governing hours of work and overtime (a matter in which both sides made concessions); safety and health; performance of work by supervisors; benefit plans; a luncheon period; and the contract preamble (in which the Union dropped its insistence that the agreement bind successors and assigns). On the still unresolved issue of economic benefits, the Company proposed a wage increase of 10 cents an hour for 7 of the 9 bargaining unit employees and a wage review for the remaining two employees. The Union turned down this proposal in favor of its original demand, which was likewise rejected. Later, the Union repeated the position that it would accept nothing short of a union shop.

At this point, members of the bargaining unit apparently became concerned about the prospect of an agreement. Several witnesses testified to talk among the employees of a slowdown or of not reporting to work. Simultaneously, the amount of sick leave claimed in January rose 1100% from the level of previous months. Employees and their spouses also began to contact the president of the Company, Thomas Olson, to get him to change the bargaining position taken by his negotiator, Goldstein. On January 15 Goldstein wrote to Chown complaining of the above-mentioned activity.

On January 28, again in the presence of the state conciliator, the parties met for what proved to be their final bargaining session. Chown denied any knowledge of a "sick-out" and stated that he was in no position to know about such employee behavior. The two sides reviewed their posi-

1. The precise offer was to accept the Union's "shop steward system." It is not entirely clear what the parties understood by this term. Presumably, it embraced both the Union's representation article, which set forth the rights and

role of union shop stewards, and its grievance procedure article, which called for shop steward participation in dispute resolution from the very first step. See footnote 7, *infra*.

tions, then conferred separately with the conciliator. The Company emerged from the conference with a modified wage proposal that would have given an hourly increase of 10 cents to all bargaining unit employees. Neither side, however, would agree to the other's wage demands. Thereupon, the Company announced that the typewritten contract brought to the January 7–8 session, as modified by handwritten emendations made in those meetings, and as orally modified at the January 28 meeting by its revised wage proposal, constituted its "last, best, and final" offer. Goldstein gave the Union until 5:00 P.M. on the following day to accept the proposal. Failing that, he warned, the Company would take economic action. No arrangements were made for further negotiations, and in the next twenty-four hours no further communications passed between Chown and Goldstein.

On January 29 the Company distributed notices to the bargaining unit employees. These told of its final offer and stated that employees would not be permitted to work until the offer was accepted. The Company maintained a lockout thenceforth, despite offers by the Union to return to work and to negotiate further (but not, to accept the Company's final proposals) at various intervals in the next six months.

On this record, the administrative law judge ruled that the Company committed a last-minute violation of the Act. He found that the Company had bargained in good faith in all negotiations until January 28; however, by its declaration of final terms on that day, it retracted the December 14 offer to trade away its grievance procedure—i. e., it insisted on its own grievance procedure—and this insistence violated § 8(a)(5).

The Board drew the same legal conclusion from altogether different facts. It ruled that the Company had been guilty of *general* bad faith, or "surface bargaining,"

and pitched its decision on the combined effect of the Company's (1) *non*-grievance proposals (its wage-benefit offerings and management rights clause in particular) and (2) bargaining tactics.

Both the administrative law judge and the Board held that the Company's lockout was illegal because it was in support of an unlawful bargaining position. The Board ruled, in addition, that the lockout was illegal because it was designed to penalize the employees for their unionization and collective bargaining.

## DISCUSSION

### I. Bargaining Faith

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." "To bargain collectively," § 8(d) explains, is to observe

> the mutual obligation . . . to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement
>
> . . . . .

The critical issue in this case is whether the Company did confer in good faith as described in § 8(d) so as to meet the requirements of § 8(a)(5). Once that determination is made, the legality or illegality of the supporting lockout under § 8(a)(3) follows swiftly.

█ The Board found against the Company on the issue of bargaining faith. By settled law, we must affirm that decision to the extent it rests on findings of fact for which there is "substantial" evidence on the record as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 407 (9th Cir. 1977).[2]

**2.** Actually, "good faith" is described as a question of mixed law and fact. *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972). Where the issues are not purely factual, the Act does not explicitly direct the

courts to exercise a particular measure of review. Manifestly, however, the measure of our oversight increases as the Board's determination approaches the purely legal. *NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 591–92 (2d

■ Substantiality of evidence, however, must take into account whatever in the record fairly detracts from its weight. *Universal Camera, supra,* 340 U.S. at 488, 71 S.Ct. 456. In reaching our decision, we have borne in mind the finding of the administrative law judge that the Company negotiated in good faith during all but the last day of the bargaining period. This finding is in direct conflict with the critical portion of the Board's determination. It is to be considered along with the probability of testimony itself, for, as the Supreme Court has stated,

> [e]vidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.

*Id.* at 496, 71 S.Ct. at 469. This is especially true where the issue, like good faith, calls for an assessment of the credibility of witnesses. *Id.*

Our examination of the basis for the Board's ruling leads us to conclude that neither the proposals nor the tactics of the Company, nor the sum of its conduct, amounts to substantial evidence of bad faith.

## A. Inferences from Bargaining Proposals
### Economic Items

■ "Particularly in the benefit or 'economic' areas," the Board found, the proposals of the Company showed "an intention . . . to penalize the employees for having engaged in protected concerted activity." 220 N.L.R.B. at 636. We disagree. There is uncontroverted testimony that at the time of negotiations the wages of bargaining unit employees were comparable to those of other employees in the area engaged in similar work. Once negotiations began, wages and benefits in the form of cash or a cash equivalent were mandatory subjects of bargaining. *NLRB v. Wooster Div. of Borg-Warner Corp.,* 356 U.S. 342, 348–49, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); *NLRB v. Katz,* 369 U.S. 736, 744, 745–46, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (sick leave, incentive pay); *Singer Mfg. Co. v. NLRB,* 119 F.2d 131, 136 (7th Cir.), *cert. denied,* 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549 (1941) (paid holidays, vacation). Under § 8(d) the Company was to bargain on these matters in good faith but it was not required to agree to the Union's proposals or to make concessions. The record shows that the Company did discuss its economic package seriously at every meeting after November 9, and, as a result of bargaining, changed its position on vacation leave and wages. Its final offer called for a wage increase of 10 cents an hour, one additional paid holiday, and a bonus of 10 hours' pay for every 90-day period of perfect attendance and punctuality. Despite a reduction in paid sick leave from 12 to 6 days, the Board's own calculations show that these terms would have represented some improvement in economic benefits.[3]

■ In the Board's opinion, nevertheless, it is a mark against the Company that "it was offering no major improvements in wages and working conditions." Brief of Petitioner at 27. As we discuss at greater length below, that reasoning betrays inappropriately partisan expectations. The right to union representation under the Act does not imply the right to a better deal. The proper role of the Board is to watch over the process, not guarantee the results, of collective bargaining. *H. K. Porter v. NLRB,* 397 U.S. 99, 109, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).

---

Cir. 1961). As our opinion makes clear, however, even a "substantial evidence" review does not change the result in this case.

**3.** The Board assumed a work year of 2080 hours and wages of $5.00 an hour. 220 N.L.R.B. at 637 n. 6. Using these figures, the wage and holiday proposals would have represented definite increases of $208.00 and $40.00 in annual benefits respectively; the bonus proposal a possible increase of $200.00; and the sick leave proposal a possible decrease of $240.00. Each employee thus stood to gain between $8.00 (assuming he was sick in each quarter and for 12 or more days of the year) and $448.00 (assuming no absences and complete punctuality).

*Non-Economic Items*

The Board's finding of bad faith also rests on several of the non-benefit items that appeared in the Company's final offer—the terms that outlined the scope of the management prerogative (management rights, integration, and waiver-of-past-practices clauses), and those that defined the means of registering protest and dissent (no-strike and grievance-and-arbitration clauses). We consider these in order.

■ 1. An employer may insist on a management rights clause[4] to impasse without violating the Act. *NLRB v. American Nat'l Ins. Co.,* 343 U.S. 395, 409, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). The Board cites *American National Insurance,* but in the next breath accuses the Company of making "proposals clearly designed to force the Union into abandoning its *statutory rights and duties.*" 220 N.L.R.B. at 636

(emphasis added). We are not sure what force the accusation has, that the Supreme Court has not already answered. If the point is merely that

> absent contractual waiver, the Union has a right to a meaningful opportunity to bargain over any change the Company might wish to make in the employees' wages, hours, or other conditions of employment during the term of the contract,

Brief of Petitioner at 24, we agree, and simply point out the Board's own reference to the possibility of "contractual waiver." If the point is that the Union has a *duty* of representation to its members, which forbids it to concede certain prerogatives to management, and correspondingly forbids management to insist upon these prerogatives, we find the doctrine novel. The Board cites no statutory or case law in its support.

4. The management rights clause included in the Company's final offer reads:

ARTICLE XIII
MANAGEMENT RIGHTS

*Section 1.* All management rights, powers, authority and functions, whether heretofore or hereafter exercised, and regardless of the frequency or infrequency of their exercise, shall remain vested, exclusively in the Company. It is expressly recognized that such rights, powers, authority and functions include, but are by no means whatever limited to, the full and exclusive control, management and operation of its business and its plant; the determination of the scope of its activities, products to be processed or manufactured, and methods pertaining thereto, the location of such processing or manufacturing, the materials and products to be acquired or utilized, and the machinery and equipment to be utilized, and the layout thereof; the right to establish or change shifts, schedules of work and production schedules and standards; the right to establish, change, combine or eliminate jobs, positions, job classifications and descriptions; the right to establish wage rates for new or changed jobs or positions; the right to establish or change incentive or bonus compensation; the right to introduce new or improved procedures, methods, processes, facilities, machines and equipment or make technological changes; the right to maintain order and efficiency; the right to contract or subcontract any work; the determination of the number, size and location of its plant or plants or any part thereof, and the extent to which the means and manner by which its plant or plants, or any part thereof, shall be operated, relocated, shut down or abandoned; the right to terminate, merge, consolidate, sell or otherwise transfer its business or any part thereof; the right to make and enforce safety and security rules and rules of conduct; the determination of the number of employees, the assignment of duties thereto, and the right to change, increase or reduce the same, and the direction of the working forces, including but by no means limited to hiring, selecting and training of new employees, and suspending, scheduling, assigning, discharging, laying off, recalling, promoting, retiring, demoting, and transferring of its employees.

*Section 2.* It is the intention of the Company and the Union that the rights, powers, authority and functions referred to herein shall remain exclusively vested in the Company except insofar as specifically surrendered or limited by express provisions of this Agreement.

While the clause is broad, its detail is fully explicable (and was so justified by the chief negotiator for the Company) in light of the known tendency of courts and the Board to apply a strict reading to management rights clauses that are vaguely worded. *See NLRB v. C & C Plywood Corp.,* 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); *Steelworkers v. Warrior & Gulf Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *LeRoy Mach. Co.,* 147 N.L.R.B. 1431 (1964); *Beacon Pierce Dyeing & Finishing Co.,* 121 N.L.R.B. 953 (1958).

Apparently, even the Board would not complain if there were "significant economic benefits to compensate for the loss [of representation rights during the contract term]." *Id.* at 20–21. But if the only question is whether a waiver price is right, then the Board is again insinuating its judgment on the terms of an agreement that the parties themselves must reach.

■ 2. An integration, or "zipper," clause seeks to close out bargaining during the contract term and to make the written contract the exclusive statement of the parties' rights and obligations. It is nothing but a diluted form of waiver, and so is governed by the same principles that apply to a management functions clause. The existence and utility of an integration clause have been recognized by the Supreme Court. *See NLRB v. C & C Plywood Corp., supra* n. 4, 385 U.S. at 423, 87 S.Ct. 559. The Company could rightly insist on its inclusion in the contract.

■ 3. The original proposal of the Union contained a continuation-of-past-practices clause. The Company felt that its operations in the past had been quite loosely handled, and that it would be difficult to know what past practices the Union might rely on in the future. It therefore rejected the Union proposal and insisted on a clause waiving all past practices as a basis for the agreement. The Company did offer to consider specific practices if the Union would submit a list of what it had in mind. The Union failed to do this. We agree with the administrative law judge that the Company's action was reasonable under the circumstances.

■ 4. A no-strike clause is a common feature of collective bargaining agreements. Frequently, indeed, it is *quid pro quo* for a binding arbitration clause and therefore a fundamental element of the federal policy favoring arbitration of labor disputes.[5] *See Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 377, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 247–48, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The Board reasons backward from the association of these terms, to argue that a no-strike clause is evidence of bad faith when, and to the extent that, the range of subjects on which employees may not strike is broader than that for which arbitration of grievances is available. We cannot agree that a no-strike clause has only derivative value. An agreement to arbitrate may be sufficient, but it is not necessary, consideration for an agreement not to strike. *See Drake Bakeries v. Bakery Workers,* 370 U.S. 254, 261 and n. 7, 82 S.Ct. 1346, 1351, 8 L.Ed.2d 474 (1962) (rejecting the "flat and general rule that these two clauses are properly to be regarded as exact counterweights"). Moreover, the policy favoring arbitration is only an aspect of the broader federal policy favoring the substitution of collective bargaining for industrial strife. No-strike clauses are a mandatory subject of collective bargaining, *Borg-Warner, supra,* 356 U.S. at 350, 78 S.Ct. 718; *American National Insurance, supra,* 343 U.S. at 408 n. 22, 72 S.Ct. 824; *NLRB v. Bricklayers & Masons Internat'l U., Local No. 3,* 405 F.2d 469, 470 n. 1 (9th Cir. 1968), and the Company was entitled to insist upon its term.[6]

**5.** We note that the Union, in this case, while insisting that the Company submit to arbitration of arbitrable grievances, wished to preserve for itself the unfettered right to strike.

**6.** Similar argument was presented to the Fifth Circuit in *NLRB v. Cummer-Graham Co.,* 279 F.2d 757 (1960). That court rejected it as follows:

It may be that most no-strike clauses are accompanied by arbitration provisions. It may be too, that if we were entitled to an opinion, which we are not, we would believe that arbitration would normally be a desira-

ble adjunct of a commitment not to strike. These are matters for management and labor to resolve, if they can, at the bargaining table. If they cannot there be decided, then neither Board nor Court can compel an agreement or require a concession. [Citations omitted.] We do not think that the Supreme Court held, or intended to hold, in *Lincoln Mills,* that a no-strike clause and an arbitration clause were so much one that a persistent demand for the one without acquiescing in the other is a refusal to bargain in good faith.

*Id.* at 759–60.

5. The Company's grievance-and-arbitration clause[7] is the source of more confusion than any other term. It was the sole basis on which the administrative law judge found that the Company violated the Act. One cannot tell from the law judge's decision, however, whether he found that the Company (a) insisted on its proposal in good faith, unaware that aspects of the grievance procedure were permissive subjects of bargaining; or (b) hardened its bargaining position, in bad faith, on an otherwise mandatory subject. More confusing still, the Board chose to affirm the law judge's findings and conclusions "only to the extent consistent [with its opinion]"—which omitted any mention whatsoever of the grievance proposal. Under these conditions, we examine the matter afresh.

We find that we do not need to decide whether the proposed grievance procedure was in all respects a mandatory subject (and therefore bargainable to impasse), for the article was not a cause of impasse in this case, and under the circumstances the Company was under no obligation to bargain until it became so.[8]

7. The grievance and arbitration clause reads, in relevant part:

ARTICLE XVIII
GRIEVANCE AND ARBITRATION

Section 1. A grievance is hereby defined as any complaint, difference or dispute arising out of the interpretation or application of a specific provision of this Agreement. Grievances shall be limited to matters of interpretation or application of expressed provisions of this Contract.

* * * * * *

Section 3. In the event a grievance as defined above in section 1 arises, there shall be no suspension of work but such controversy shall be treated as a grievance and shall be settled, if possible, by the Union and the Company in the following manner: (a) the employee or employer concerned shall endeavor to adjust the matter with their immediate supervisor. If unable to arive [sic] at a satisfactory adjustment, the matter shall then be presented to the Plant's superintendent, in writing, signed by the employee and the Union. If then unable to arrive at a satisfactory adjustment, the matter shall be taken up by the International Representative of the Union together with the Plant's superintendent. If the parties are unable to arrive at a satisfactory adjustment of a grievance, the matter may be referred by either party to final and binding arbitration.

8. Generally, the manner in which disputes are to be resolved during the term of a collective bargaining agreement is a mandatory subject of bargaining. Either party may thus insist on its position to the point of impasse, provided it does so in good faith. *NLRB v. Boss Mfg. Co.,* 118 F.2d 187 (7th Cir. 1941).

However, the argument runs, the general right to insist on one's position does not extend to the choice of the other side's representative in grievance proceedings. Here the Company wanted to exclude the Union from the first step of grievance processing and dictate who the Union representative should be in subsequent steps. This, it is contended, is a matter of concern between the Union and employees, not between the employer and employees. Under *Borg-Warner,* therefore, it is not a mandatory subject of bargaining.

We note, without reaching a conclusion, that both *Borg-Warner* and *General Electric v. NLRB,* 412 F.2d 512 (2d Cir. 1969), upon which the Board also relies concerned the right of employees to be undisturbed in their selection of a representative for the purpose of collective bargaining. Under the statute, this is a different matter from adjusting grievances. Section 9(a) provides:

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . . : *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative . . . : *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment.

Thus, the Act gives the Union the right to bargain collectively for employees, and the right to be present while the grievances of employees are adjusted. But it does not give the Union, in so many words, the right to adjust grievances. See 1947 U.S.Code Cong. Serv. 1152; Tr. at 327.

*Bethlehem Steel,* 89 N.L.R.B. 341 (1950), upon which the administrative law judge relied, is therefore inapplicable. The issue in that case was the right of the Union to attend while grievances were being adjusted. The opinion explicitly reserved the question here posed, of the right of the Union to adjust grievances. *Id.* at 344.

While clearly the settlement of some individual disputes will have ramifications for other employees in the bargaining unit, we do not

Unlike the other terms discussed, Article XVIII ("Grievance and Arbitration") was the subject of a bargaining offer and negotiable until the end of the meeting on January 28.[9] We therefore view it in a very different light. The record shows that by the time it lost its negotiability, the parties had reached an irremediable impasse on other issues. The Company and the Union met on seven occasions over a period of two months. They discussed all proposals and explained all positions. On January 7, they felt it appropriate to enlist the services of a state labor conciliator. Transcript of Hearing (Tr.) at 87–91. As the meeting that day closed, a union negotiator was heard to remark, "It looks like a strike," or words to that effect. Id. at 279. The conciliator also commented that "the Union wants a shop steward system, but the real main point is money." Id. at 328.[10] From then on the employees engaged in a partial sick-out.[11] The crucial meeting on January 28 was arranged through the efforts of the conciliator, who opened by saying that the situation appeared to be at an impasse. Id. at 348. Later, after conferring with each side separately, he expressed the equivalent opinion that the minimum expectations of the employees were a great deal higher than the employer's proposals. Id. at 356. At this point the Company was offering wage increases of 10 cents an hour, while the Union was demanding increases of between 85 cents and $1.05 an hour. The Company altered its wage proposal to include increases for all employees. The re-

jection of this new offer, viewed against the background of preceding events, gave the Company ample ground to believe that further bargaining would be fruitless. Goldstein then announced that the proposals on the table constituted the Company's "best, last, and final offer." This stroke, which made the grievance article non-negotiable, came at a time when it was no longer important.

▮▮▮▮ Those who bargain collectively are normally under an obligation to continue negotiating to impasse on all mandatory issues. Chambers Mfg. Co., 124 N.L.R.B. 721 (1959), enf'd, 278 F.2d 715 (5th Cir. 1960). The law relieves them of that duty, however, when a single issue looms so large that a stalemate as to it may fairly be said to cripple the prospects of any agreement. Cheney California Lumber Co. v. NLRB, supra n. 10, at 380; NLRB v. Wire Products Manufacturing Corp., 484 F.2d 760, 766 (7th Cir. 1973); Taft Broadcasting Co., 163 N.L.R.B. 475, 478 (1967), enf'd sub nom. AFTRA v. NLRB, 129 U.S.App.D.C. 399, 395 F.2d 622 (1968). The record leaves no doubt that wages and related benefits were a central and irreconcilable issue in this case. A further discussion of grievance procedures would have served no useful purpose, and therefore was not called for.[12]

▮▮▮▮ A proposal, not the cause of impasse, may nevertheless contain terms so hostile to the role of the other side's bargaining representative that it constitutes

---

understand that the law has yet equated the interests that are at stake in collective bargaining and grievance adjustment on this basis. See Hughes Tool Co. v. NLRB, 147 F.2d 69, 72–73 (5th Cir. 1945), enforcing Hughes Tool Co., 56 N.L.R.B. 981 (1944); Gorman, Basic Text on Labor Law 389 (1976).

9. The administrative law judge found that the Company's offer to agree to the Union's shop steward system in return for acceptance of the Company's management rights and no-strike clauses remained open until January 28.

10. While the assessments of the conciliator of the state of negotiations at different points are not legally conclusive, they are relevant to the issue of the Company's reasonable and sincere belief, Cheney Calif. Lumber Co. v. NLRB, 319 F.2d 375, 380 (9th Cir. 1963), that an impasse existed and that the economic expectations of the two sides were irreconcilable.

11. The Board "[did] not adopt or pass on the Administrative Law Judge's conclusion that the employees engaged in a partial 'sick-out' in order to bring pressure on the company to agree to the Union's demand." 220 N.L.R.B. at 638 n. 8.

12. This assessment of the cause of impasse is confirmed by a telephone conversation between Chown and Goldstein a week or ten days later. In it Chown remarked that if an agreement were to be reached, the Company would have to come up with "more money and union security." Tr. at 360.

evidence of bad faith. This is not the case here. An employer may reasonably believe that labor disputes will be more easily settled at the first stage by direct contact between the aggrieved employee and his foreman than by the intervention of a union to represent the worker; that a shop steward committee of six is a cumbersome vehicle to represent a labor force of nine; and that the international representative of the union would be more skilled and professional in handling grievances than a member of the local union. Whether the employer is entitled to insist on his beliefs is, as we have said, a question reserved. But the beliefs themselves, as embodied in the Company's grievance and arbitration proposals, do not support a charge of bad faith in negotiations. The Company's previous willingness to accept the shop steward system in exchange for its management rights and no-strike clauses, and its willingness to have an employee act as agent of the international union representative when the latter was unavailable, put to rest any remaining doubts of its good faith on this subject.

B. Inferences from Bargaining Tactics

■ 1. The Board finds evidence of bad faith in the interrelationship of terms in the Company's final offer. It notes that (1) under the Company's salary proposal, the wages of all employees would rise by 10 cents the first years, but there would be no further guarantee of wage improvement as the Company had discretion to reclassify employees within their wage range; (2) under the attendance and punctuality bonus, excused absences such as the first day of sickness would not count as days worked; and (3) under the management rights clause, the Company had the exclusive and unreviewable right to discharge employees, although the article on discipline provided that discharges should be for just cause. On the basis of these offsetting provisions the Board accuses the Company of conducting a "shell game."

If, in fact, the contradictions were intentional, and if they were enforceable in the Company's favor, they amount in our judg-ment to evidence of sharp draftsmanship at most. The terms of the contract were there for the Union to read. It was not compelled to accept them. That no agreement was ever reached on wages, or an attendance bonus, or management rights, is some indication that these terms were not inherently deceptive. There is no evidence that the Company ever falsely described its written proposals. There is no evidence that it ever subsequently altered non-initialled terms to nullify concessions made elsewhere in the contract. While we would accept that some of the terms are harsh—in particular the manner in which sickness served to disqualify an employee from bonus eligibility—that does not give the Board or the courts the power to strike them.

2. Finally, the Board finds evidence of bad faith in the relationship between the Company's final offer and its earlier proposals. It notes that the "last, best, and final" offer omitted (1) a dues check-off provision, which on November 9 the Company had said it would consider if the Union would accept a corollary hold-harmless clause; (2) a ten-day statute of limitations for the filing of grievances, which on December 5 the Company had noted in writing as a possible revision of the three-day period proposed; and (3) the Union's grievance procedure involving shop stewards, which on December 14 the Company had offered to trade for Union acceptance of the Company's management rights and no-strike provisions. In the Board's opinion these omissions represent a "retrenchment on previous concessions." Brief of Petitioner at 33.

We question how many of these "offers" were really "firm." According to Chown, the Company took the position that if it *were* to agree to a dues check-off clause, then the clause would have to contain an indemnification proviso. Tr. at 19. By Goldstein's account, his notation on a second issue was that the statute of limitations *might* be ten days. Tr. at 327. These witnesses portray a carefully guarded management position, in all respects consistent with the beatitude that, in bargaining, it is more blessed to receive than to give uncon-

ditional offers. We are inclined to believe that the Company's offers were less firm than the Board assumes.

 In addition, we question the Board's unreflective treatment of "offers" as if they were "concessions." The negotiators agreed to indicate any and all accords by their initials. All initialled clauses were included in the Company's last offer. Absent abuse not present here, it is perfectly legitimate for a party to retract a proposal before the other side has accepted it. It may do so because the offer was germane only to the context in which it was made, or because it feels a different offer is more likely to be accepted, or because it has further determined the relative bargaining strengths of the opposed sides. The law does not require that each offer and indication of possible acceptance be included in the final contract before a legal impasse is reached. To do so would hamper the ability of parties to explore their respective positions early in their negotiations. "To bargain collectively" does not impose an inexorable ratchet, whereby a party is bound by all it has ever said.

C. The Board's Analysis

██ The Board would have us look at the sum of the evidence, not merely pieces, to decide whether the Company was bargaining in good faith. Clearly, it would be disingenuous to decline.

A state of mind such as good faith is not determined by a consideration of events viewed separately. The picture is created by a consideration of all the facts viewed as an integrated whole.

*NLRB v. Stanislaus Imp. & H. Co.*, 226 F.2d 377, 381 (9th Cir. 1955). Equally clearly, our judicial review of the Board's decision is most problematic at the stage of holistic analysis. Nevertheless, we do not find the requisite substantial evidence of bad faith in the record as a whole.

The cases of surface bargaining on which the Board relies are factually distinguisha-

ble. *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131 (1st Cir.), *cert. denied,* 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); *Holmes Tuttle Broadway Ford, supra* n. 2; *NLRB v. Johnson Manufacturing Co. of Lubbock,* 458 F.2d 453 (5th Cir. 1972; *Continental Insurance Co. v. NLRB,* 495 F.2d 44 (2d Cir. 1974); and *NLRB v. Big Three Industries, Inc.,* 497 F.2d 43 (5th Cir. 1974), all involve much more aggravated behavior on the part of management than is present here.

Our divergence from the Board is most apparent in the evaluation of bargaining proposals. As Petitioner argues,

the Board 'must take some cognizance of the reasonableness of the position taken by an employer in the course of bargaining negotiations' if it is not to be 'blinded by empty talk and by the mere surface motions of collective bargaining . .' [Authorities omitted.]

*Holmes Tuttle Broadway Ford, supra,* 465 F.2d at 719. The issue is how proposals most appropriately should be evaluated, to determine "reasonableness."

The Board's approach is best illustrated when it condemns the Company's final offer as "terms which no self-respecting union could be expected to accept." 220 N.L. R.B. at 637. The quotation is from *Reed and Prince, supra,* 205 F.2d at 139, a case with whose result we have no quarrel, but which contains language we have questioned once before. *See NLRB v. MacMillan Ring-Free Oil Co.,* 394 F.2d 26, 29 (9th Cir. 1968). The utility and appropriateness of a "self-respecting union" standard are still doubtful. As an analytic tool, the phrase seems rather better suited to conclude inquiry than to advance it. As a test of good faith under the National Labor Relations Act, it directs first attention to the bargaining position of the party whose interests are opposed to the employer. Thus, it comes perilously close to determining what the employer should give by looking at what the employees want.[13] More

---

13. Even if the *Reed & Prince* standard is simply interpreted as a reference to the general prac-

tice within an industry, a finding that the Company did not offer what most unions are accus-

relevant in judging of good faith and reasonableness, it seems to us, are other factors such as the employer's economic position and the past level of employee benefits. By those standards, as we have indicated, the Company's proposals cannot be characterized as surface bargaining.

■■■■ A finding of bad faith would require the Company to yield despite the Union's inability to enforce its will through the classic economic weapons of labor relations. But the obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d); *American National Insurance, supra,* 343 U.S. at 404, 72 S.Ct. 824; *Queen Mary Restaurants, supra,* 560 F.2d at 411. Nor may the Board, "directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *American National Insurance, supra,* 343 U.S. at 404, 72 S.Ct. at 829, *cited in H. K. Porter, supra,* 397 U.S. at 106, 90 S.Ct. 821; *NLRB v. Insurance Agents' Union,* 361 U.S. 477, 487, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). While the parties' freedom of contract is not absolute under the Act,

> allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.

*H. K. Porter, supra,* 397 U.S. at 108, 90 S.Ct. at 826.

■■■■ On the central issue of bargaining intent, the events in question resolve into a case of hard bargaining between two parties who were possessed of disparate economic power: a relatively weak Union and a relatively strong Company. The Company naturally wished to use its advantage to retain as many rights as possible. That desire is not inconsistent with its statutory duty to bargain in good faith. *Chevron Oil Co. c. NLRB,* 442 F.2d 1067, 1073 (5th Cir. 1971).

## II. *Lockout*

■■■ Our ruling on the lockout is controlled by the decision of the Supreme Court in *American Ship Building v. NLRB,* 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). *American Ship Building* held that a lockout after impasse, when used as a means of bringing pressure in support of an employer's lawful bargaining position, does not violate § 8(a)(3) or (1). *Id.* at 318, 85 S.Ct. 955. As the Company's bargaining position was lawful, so was the lockout in support of its position.

The Board makes a passing claim that the lockout was also illegal because it was prompted by a desire to discourage union membership. *See Id.* at 308, 85 S.Ct. 955; *NLRB v. Golden State Bottling Company,* 401 F.2d 454, 457 (9th Cir. 1965). Such an inference is not to be made lightly. *NLRB v. Wire Products Manufacturing Corp., supra,* 484 F.2d at 765. The Board does not cite any evidence to support its contention, nor can we find any.

## III. *Conclusion*

We find that there is not substantial evidence on the record as a whole to support the Board's ruling (1) that the Company went through the motions of bargaining as a pretense to avoid reaching agreement, or (2) that it locked out its employees to discourage union support. Accordingly, we deny the petition for enforcement.

---

tomed to getting in collective bargaining still does not establish the requisite element of bad faith. Where courts have relied upon current practice, they have used it as a shield to allow a party to insist on its position, not as a sword to compel the other side to give in. *Cf. American National Insurance, supra,* 343 U.S. at 407, 72 S.Ct. 824 (right of employer to insist on management rights clause).