Filed 11/13/13  Long Beach Police Officers Assn. v. City of Long Beach CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LONG BEACH POLICE OFFICERS ASSOCIATION, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CITY OF LONG BEACH et al., <br><br> Defendants and Appellants. | B246306 <br><br> (Los Angeles County <br> Super. Ct. No. NS026076) |

 

 

APPEAL from a judgment of the Superior Court of Los Angeles County, Michele E. Flurer, Judge.  Reversed.

Robert E. Shannon, City Attorney and Christina L. Checel, Deputy City Attorney for Defendants and Appellants.

James E. Trott for Plaintiff and Respondent.

_____

**INTRODUCTION**

The City of Long Beach, a municipal corporation, and James McDonnell, the City of Long Beach's chief of police (the City), appeal from a judgment granting a permanent injunction in favor of respondent Long Beach Police Officers Association (POA). The judgment prohibited the City from changing a long-standing practice of allowing motor patrol officers to take home their work vehicles, unless the POA agreed to the change. The City contends the trial court erred in determining that a collective bargaining agreement prohibited the City from changing the practice. The City further contends that the POA waived its right to negotiate about the proposed change pursuant to the Meyers-Milias-Brown Act (MMBA), Government Code section 3500 et seq.[1] We agree with the City and reverse.

**FACTUAL AND PROCEDURAL HISTORY**

A.    Take-Home Vehicle Policy

For over 60 years, the City allowed its motor patrol officers to commute between home and work on city-owned police motorcycles. On February 10, 2003, the City promulgated a revised "Take-Home Vehicle Policy," applicable to all city employees. The policy, codified at Administrative Regulation 4-2, sought to reduce the number of city vehicles garaged at employees' homes. It specifically provided that "[p]olice motorcycles will be issued to police officers as take-home vehicles when the City is unable to garage the motorcycles for security and weather protection." The policy also required an annual review of all take-home vehicles. "Justification for each vehicle, including mileage verification, will be supplied at that time." Despite promulgating the revised policy, the City did not

---

[1]    All further statutory citations are to the Government Code.

change its practice of allowing motor officers to take home their work vehicles; it maintains that it lacked the necessary facilities to garage the motorcycles until 2011.

B.     The Memorandum of Understanding

In March 2009, the City and the POA opened negotiations over the financial compensation of the City's police officers.  The parties reached an agreement on a memorandum of understanding (MOU), effective October 1, 2009 to September 30, 2014.  In the MOU, the City and the POA stated that they intended the MOU to cover "the wages, hours and working conditions of the employees represented by the [POA]."  The MOU acknowledged, however, that "there exist[] within the Police Department, personnel policies and procedures, general orders, departmental policies and rules and regulations.  Except as specifically modified by this MOU, these rules and regulations, and policies and any subsequent amendments thereto shall be in full force and effect during the term of this MOU. Before any new or subsequent amendments to these policies or departmental rules and regulations directly affecting wages, hours and terms and conditions of employment are implemented, the City, through the Police Chief, shall meet in accordance with [the MMBA,] Government Code section 3500 et seq., with the [POA] regarding such changes."  (MOU, Article One, Section VII.)

The MOU contained a management rights clause in Article One, Section VI, wherein the City retained its right to make fundamental managerial or policy decisions.  That clause also required the City to meet and confer with the POA "over the impact of the exercise of a right of management upon the wages, hours, terms and conditions of employment."

In separate articles, the MOU detailed the officers' "Salaries and Compensation," "Paid Time Off Benefits," "Health Insurance Benefits,"

3

"Retirement" benefits, and "Other Benefits and Working Conditions." The MOU also established a grievance procedure and a transfer policy.

Finally, in Article Nine, Section I, the MOU provided:

"A.    It is agreed that this constitutes the full and complete [MOU] between the parties, and that all other matters presented by the parties during the conduct of the meet and confer process which result[ed] in this [MOU] are withdrawn by both parties as matters in dispute for the term of this [MOU], and may be raised again by mutual consent only.

"B.    This section in no way inhibits or restricts the City or the [POA] from the lawful conduct of the meet and confer process regarding issues not presented during these negotiations."

The MOU specifically mentioned motor officers only in Article Two, "Salaries and Compensation." Under "Section II - Skill Pay," it provided that motor officers would be paid $350 per month for their skill in driving motorcycles. Nothing in the MOU referred to the take-home vehicle policy, and the parties agree that the practice of allowing motor officers to take home their work vehicles was never raised by any party during negotiations.

C.    Further Discussions About Take-Home Policy

On October 19, 2011, Deputy Chief of Police Robert Luna and Commander Richard Rocchi met with motor officers and informed them that the police department was considering changing the take-home vehicle policy starting in January 2012. Deputy Chief Luna stated that the department was having difficulty justifying the practice of allowing officers to take home their work vehicles. He asked officers for, and received, ideas on how to justify the associated costs to city management.[2]

_____

[2]    According to City estimates, approximately 40 percent of the maintenance and fuel budget allocated for police motorcycles is attributable to the motor officers' commute to and from work. In fiscal year 2011, the amount was

The next day, POA President Stephen James contacted Deputy Chief Luna and informed him that the take home privileges were part of the motor officers' compensation package, and that any change to compensation was subject to collective bargaining. Deputy Chief Luna then spoke with Deputy City Attorney Christina Checel. In Checel's opinion, "it was likely a meet and confer issue since it impact[ed] a longstanding past practice of allowing motor officers to take their work vehicle home." Thereafter, on November 8, 2011, on behalf of the department, Deputy Chief Luna sent a letter to POA President James requesting a meet and confer "regarding the 'take-home' portion of the Motor Patrol Detail's functions."

On November 21, 2011, on behalf of the POA, its general counsel, James Trott, responded by declining to meet and confer. He stated that the POA had agreed to an MOU two years earlier, had reopened the MOU and given away an eight percent pay raise months earlier, and did not wish to reopen the issue of the "long [standing] policy and clearly established past practice of allowing [motor] officers to [take their bikes home after work]." Trott noted that the MOU contained a "'zipper clause'" in Article Nine, Section I of the MOU.[3] Based upon the zipper clause, Trott declined "the request at this time to meet and confer."

On December 16, 2011, Checel sent a letter to Trott, making a second request to meet and confer. In the letter, Checel stated that the City did not

_____

approximately $121,152. In fiscal year 2012, it was $111,243. In addition, the City is responsible for any injuries sustained by motor officers during their commute. In fiscal year 2012, the City spent $80,235 on medical expenses for three officers injured during their commutes, and it anticipated spending a further $150,000 for these officers' medical treatment.

[3] Trott's November 21 letter indicated that the "'zipper clause'" he referred to was paragraph A of Section I of Article Nine.

5

"disagree" with Trott's assertion that "the motorcycles the officers take home are tantamount to compensation, thereby rendering this issue a mandatory subject of bargaining." She also stated that the City agreed that "allowing motor patrol officers to take home City owned motorcycles is a long-standing past practice and a perk of employment," but disputed Trott's characterization of the practice as a "right." Checel disagreed that the zipper clause in the MOU prevented the City from meeting and conferring over the take-home vehicle policy, noting that the "past practice of allowing officers to take home City owned motorcycles is not contained within the MOU." She further stated: "Importantly, both the City and the union have an obligation to meet and confer in good faith. Where an employer offers reasonable written notice and provides the union an opportunity to respond, but the union fails to respond, the employer may unilaterally act. . . . [¶] While your letter declining the City's request to meet and confer is a waiver of your rights under the MMBA, the City makes a second request that the POA meet and confer on the proposed change in practice regarding City owned motorcycles."

On December 21, 2011, Trott responded by again declining to meet and confer. He stated that the "refusal to agree to this last meet and confer is premised on the time tested and usually reliable notion of 'enough is enough.'" Trott reiterated his assertion that the zipper clause in the MOU permitted the POA to reject the City's request to meet and confer. He stated that "the subject of motor compensation was discussed by our clients during negotiations, an agreement reached, and no further discussions were had, such as the taking of their motorcycles[;] hence the issue was laid to rest."

Thereafter, the City summarily changed the take-home vehicle policy, effective September 28, 2012.

D.    Procedural Background

6

On September 21, 2012, the POA filed a verified complaint for a temporary restraining order, a preliminary injunction, a permanent injunction, and a writ of mandate. In the complaint, the POA sought to prohibit the City and the police chief from changing the "take home policy" during the term of the MOU or until such time as the parties agreed to a change. The complaint alleged that the take-home vehicle policy had been in place for over 60 years, and that the policy provided "an economic benefit for [the motor] officers." It also alleged that during the negotiations on the current MOU, "the issue of 'motors' was discussed by each party on multiple occasions and in fact a change was made over the previous MOU to grant motor officers an additional amount of $25.00 per month for skill pay." The complaint further alleged that the POA had declined to meet and confer with the City on the issue of the take-home vehicle policy on two separate occasions in November and December 2011 because, "[h]aving just completed the contract re-opener negotiations and giv[en] back to [the] City items of a monetary nature, [the] POA was no longer in a position to discuss further give-aways to [the] City."

The City filed an opposition, arguing (1) that it was not required to meet and confer to implement the change in the take-home vehicle policy, as the change was a fundamental managerial or policy decision; (2) that if it was required to meet and confer under the MMBA, it had met its obligations by making two requests to meet and confer; and (3) that the zipper clause in the MOU did not authorize the POA to refuse to meet and confer.

On September 27, 2012, the trial court held a hearing on the complaint. On October 10, 2012, the court issued an order granting the POA's request for injunctive relief. A judgment granting a permanent injunction was entered the same day. In the judgment, the court found that "compensation for motor officers was discussed during contract negotiations pertaining to the current [MOU,] and the practice of motor officers being allowed to take their motorcycles home is a

7

long standing past practice." The court further found that the POA was "within [its] right, under the zipper clause of the [MOU], to refuse the request to meet and confer by the City of Long Beach, and the 2003 policy outlining care and storage of motorcycles was never bargained for with [the POA]." The City timely appealed from the judgment.

## DISCUSSION

A.      Standard of Review

The parties disagree on the applicable standard of review. The City contends the case should be reviewed de novo, whereas the POA contends the substantial evidence standard of review applies.

Generally, a permanent injunction is reviewed on appeal for the sufficiency of the evidence to support the judgment. (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646.) However, "[w]hether a permanent injunction should issue becomes a question of law where the ultimate facts are undisputed and in such a case the appellate court may determine the issue without regard to the conclusion of the trial court." (*Eastern Columbia, Inc. v. Waldman* (1947) 30 Cal.2d 268, 273.) Moreover, where the propriety of the injunctive relief depends upon a question of law -- such as statutory construction or interpretation of a contract -- we independently review the trial court's decision. (See *Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1300 [reviewing order granting preliminary injunction de novo, as its validity depended upon statutory construction]; see also *City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 70-71 [interpretation of MOU a question of law].) Here, the propriety of the permanent injunction hinges on an interpretation of the MOU and the MMBA. Accordingly, we independently review the trial court's grant of a permanent injunction.

8

B.    The MOU and Its Zipper Clause

The trial court determined that the City's decision to change the take-home vehicle policy violated the MOU.  Specifically, the court determined that the zipper clause prevented the City from changing the take-home vehicle policy without the consent of the POA, and that the POA was within its rights under the zipper clause to decline to meet and confer about the proposed change.

A zipper clause "seeks to close out bargaining during the contract term and to make the written contract the exclusive statement of the parties' rights and obligations."  (*NLRB v. Tomco Communications, Inc.* (9th Cir. 1978) 567 F.2d 871, 879; *City of Fresno v. People ex rel. Fresno Firefighters* (1999) 71 Cal.App.4th 82, 98 ["'general purpose of a zipper clause is to "zip up" the collective bargaining agreement'"].)  A reviewing court "will look to the language of [a] particular zipper clause and give it the breadth the language warrants."  (*Los Rios Classified Employees Association v. Los Rios Community College Dist.* (1988) PERB Dec. No. 684 at p. 16.)

In referring to the zipper clause, the POA apparently refers to paragraph A of Section I of Article Nine of the MOU.  The entire section consists of only two paragraphs, and there is no serious contention that they should not be read together.  The section provides:

> "A.    It is agreed that this constitutes the full and complete [MOU] between the parties, and that all other matters presented by the parties during the conduct of the meet and confer process which result[ed] in this [MOU] are withdrawn by both parties as matters in dispute for the term of this [MOU], and may be raised again by mutual consent only.
> "B.    This section in no way inhibits or restricts the City or the [POA] from the lawful conduct of the meet and confer process regarding issues not presented during these negotiations."

Under Section I, the parties agreed to the following three provisions.  First, as set forth in paragraph A, the MOU would be the exclusive statement of the

parties' rights and obligations. Second, as to "matters presented by the parties during the conduct of the meet and confer process," those matters would be withdrawn as matters in dispute during the term of the MOU and could be raised again only by mutual consent. Finally, as set forth in paragraph B, as to matters "not presented during [the] negotiations," both the City and the POA were free to utilize the meet and confer process. It is undisputed that the long-standing practice of allowing motor officers to take home their work vehicles was never presented or raised during the negotiations over the MOU. Thus, under paragraph A, the practice was not withdrawn as a disputed matter during the term of the MOU. Moreover, under paragraph B, as an issue that was "not presented during [the MOU] negotiations," the take-home policy remained one which the City or the POA could lawfully negotiate, pursuant to the meet and confer process.

The POA contends -- and the trial court determined -- that the City could not unilaterally raise the take-home vehicle policy because compensation for motor officers was raised during negotiations. In essence, the court adopted the POA's position that if *any* form of compensation was discussed, *all* issues affecting compensation were necessarily zipped up during the term of the MOU. We disagree, as the POA's broad interpretation of the zipper clause is inconsistent with other provisions in the MOU.

First, as noted, the management rights clause permitted the City to make fundamental managerial or policy decisions, even if those decisions affected the officers' wages, hours, and terms and conditions of employment. Second, aside from fundamental managerial or policy decisions, the parties agreed that a preexisting policy, rule or regulation that impacted the officers' wages, hours, and terms and conditions of employment could be changed during the term of the MOU, as long as the City complied with the MMBA. Thus, the zipper clause cannot be interpreted to preclude the City from making any change to a long-

10

standing practice that affected the motor officers' financial well-being, if that practice was not presented by either party during the negotiations.

The POA's reliance on *International Union, United Autoworkers v. NLRB* (D.C. Cir. 1985) 765 F.2d 175 is misplaced. There, the federal appellate court stated, without citation to authority, that "[g]enerally speaking, a zipper clause has the effect of incorporating all possible topics of bargaining -- both those actually discussed and those neither discussed nor contemplated during bargaining -- into the contract." (*Id.* at p. 180.) The court's statement, however, was based upon the actual language of the zipper clause at issue in the case. That zipper clause provided that each party "waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement." (*Id.* at p. 182, fn. 27.) In contrast, here, the zipper clause contains no similarly broad language. Indeed, section I makes clear that only those matters "presented" during the MOA negotiations are zipped up; matters "not presented" during the course of the MOU negotiations are not zipped up, but may be the subject of negotiations pursuant to the meet and confer process of the MMBA.

Nor does the zipper clause authorize the POA to refuse to meet and confer with the City about the proposed change to the take-home vehicle policy. The MOU specifically provides that the zipper clause does not prevent either party from using the meet and confer process to negotiate "issues not presented during [the] negotiations." Moreover, the MOU anticipated that the parties would use the meet and confer procedures outlined in the MMBA to negotiate changes to long-standing practices that affected the employees' wages, hours, and terms and

11

conditions of employment. The MOU expressly provided that "[b]efore any new or subsequent amendments to [pre-existing] policies or departmental rules and regulations directly affecting wages, hours and terms and conditions of employment are implemented, the City, through the Police Chief, shall meet in accordance with [the MMBA,] Government Code [s]ection 3500 et seq., with the [POA] regarding such changes." (MOU, Article One, Section VII.) As set forth below, the City complied with the requirements of the MMBA before attempting to implement the change in the take-home vehicle policy.

C.    The MMBA

"The MMBA applies to all local government employees in California." (*Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 812.) The purpose of the MMBA is to "promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment." (§ 3500, subd. (a).) Section 3505 requires a local government employer to "meet and confer in good faith regarding wages, hours, and other terms and conditions of employment" with its employees' exclusive representative. The obligation to "'[m]eet and confer in good faith'" is a "mutual obligation" triggered by a "request by either party." (§ 3505.)

"An employer cannot change matters within the scope of representation without first providing the exclusive representative notice and opportunity to negotiate." (*Public Employment Relations Bd. v. Modesto City Schools Dist.* (1982) 136 Cal.App.3d 881, 900.) "Unilateral change in these areas prior to impasse is seen as a violation of the duty to negotiate in good faith because it is tantamount to a refusal to bargain. However, once impasse is reached, the employer may take unilateral action to implement the last offer the union has rejected." (*Ibid.*; see also *San Joaquin County Employees Assn. v. City of Stockton*

12

(1984) 161 Cal.App.3d 813, 818 ["the duty to bargain collectively requires the employer to maintain the status quo without taking unilateral action as to wages, working conditions, or benefits until negotiations reach an impasse"].)

An employer may also unilaterally change a preexisting practice or policy if the employees' exclusive representative expressly waived its right to negotiate the subject of the change pursuant to the MMBA. (*California State Employees' Assn. v. Public Employment Relations Bd.* (1996) 51 Cal.App.4th 923, 937; see also *Stationary Engineers v. San Juan Suburban Water Dist.* (1979) 90 Cal.App.3d 796, 802 [under section 3504.5, defendant employer may unilaterally change certain terms and conditions of employment where it provided prior written notice and "plaintiffs did not appear to discuss the issues"], disapproved on another ground by *County Sanitation Dist. No. 2 v. Los Angeles County Employees Assn.* (1985) 38 Cal.3d 564.)

In sum, under the MMBA, the City and the POA are obligated to meet and confer in good faith on all matters within the scope of representation. The City may unilaterally change a preexisting policy or practice that falls within the scope of representation only when the negotiations with the POA have reached an impasse, or where the POA has waived its right to negotiate the subject of the change.

D.     Change to Take-Home Vehicle Policy

The parties dispute whether the long-standing practice of allowing motor officers to take home their work vehicles is within the scope of representation and subject to a meet and confer requirement before any change can be made. The City argues that the change to the practice is a fundamental managerial or policy decision not subject to the meet and confer requirement in the MMBA. (See *Building Material & Construction Teamsters' Union v. Farrell*, *supra*, 41 Cal.3d at p. 660 [fundamental managerial or policy decision generally fall outside the scope

13

of representation].)[4] The POA contends the change is subject to the meet and confer requirement, although it also contends that the zipper clause authorized it to decline to meet and confer with the City. We need not determine whether the change is a fundamental managerial or policy decision, as under the MOU the City was required to meet and confer with the POA.[5]

Here, the City satisfied its obligation to meet and confer with the POA about the proposed change when it made two requests to meet and confer. In its second request, the City specifically informed the POA that (1) "both the City and the [POA] have an obligation to meet and confer in good faith," that (2) "[w]here an employer offers reasonable written notice and provides the union an opportunity to respond, but the union fails to respond, the employer may unilaterally act," and (3) that "declining the City's request to meet and confer is a waiver of [the POA's] rights under the MMBA." Despite being fully advised of the potential consequences of failing to meet and confer, the POA declined to do so. This constituted a clear and unmistakable waiver of the POA's right to negotiate the

---

[4]     Citing a recent decision by the Public Employment Relations Board (PERB), the City contends that where there is a preexisting take-home vehicle policy, a local government employer need not meet and confer with the union before acting in compliance with that policy. (See *Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1291 [PERB decisions are persuasive in interpreting the MMBA].) However, that decision -- *Teamsters Local 150 v. County of Sacramento* (2013) PERB Dec. No. 2315-M) -- is factually distinguishable. There, nothing suggested that the local government employer had not bargained for the take-home vehicle policy. (*Id*. at p. 2.) In contrast, here, the trial court found that the City had not bargained for the 2003 take-home vehicle policy.

[5]     As set forth above, under the management rights clause in the MOU, the City is required to meet and confer with the POA "over the impact of the exercise of a right of management upon the wages, hours, and terms and conditions of employment."

14

proposed change. (See *California School Employees Association v. Solano County Community College District* (1982) PERB Dec. No. 219-E, at p. 11 [waiver of right to meet and negotiate may be shown by either clear and unmistakable language or demonstrable behavior]; see also *Stationary Engineers v. San Juan Suburban Water Dist.*, *supra*, 90 Cal.App.3d at p. 802 [employer may change policy after employees failed to appear to discuss proposed change despite receiving written notice]; *Stockton Police Officers' Assn. v. City of Stockton* (1988) 206 Cal.App.3d 62, 67 [union waived its right to meet and confer where public employer gave notice of proposed change in working conditions and union failed to timely invoke the meet and confer requirement].) After the POA twice refused to meet and confer, the City was entitled to summarily change the take-home vehicle policy.[6] Accordingly, the trial court erred in granting a permanent injunction.

---

[6] The POA's refusal to meet and confer also constituted a waiver of its right to negotiate the impact of the proposed changes, as the POA did not specifically demand to negotiate over the effects of the proposed change. (*Teamsters Local 150 v. County of Sacramento*, *supra*, PERB Dec. No. 2315-M at p. 6.)

15

## DISPOSITION

The superior court's order granting a permanent injunction is reversed. Costs are awarded to respondent.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MANELLA, J.

We concur:

EPSTEIN, P. J.

SUZUKAWA, J.

16