638 F.2d 1221
 106 L.R.R.M. (BNA) 2621, 90 Lab.Cas. P 12,554
 SEATTLE-FIRST NATIONAL BANK, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Financial Institution Employees of America, Local No. 1182,
Chartered by Retail Clerks International Union,
AFL-CIO, Intervenor.
 No. 79-7157.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 9, 1980.
Decided Feb. 5, 1981.
 
 Mark A. Hutchenson (argued), Davis, Wright, Todd, Riese & Jones, Seattle, Wash., George R. Murphy, Washington, D. C., on brief, for petitioner.
 
 
 1
 Marjorie Gofreed, Washington, D. C., for respondent; Elliott Moore, N. L. R. B., Washington, D. C., on brief.
 
 
 2
 On Petition for Review and Cross-Application For Enforcement of an Order of The National Labor Relations Board.
 
 
 3
 Before SNEED and FLETCHER, Circuit Judges and JAMESON,* District Judge.
 
 JAMESON, District Judge:
 
 4
 Seattle-First National Bank has petitioned for review of an order of the National Labor Relations Board finding that the Bank violated Section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1), by failing to bargain in good faith with Financial Institution Employees of America, Local No. 1182 (the Union), and by implementing portions of its last offer before a valid impasse had been reached.[1] The Board in a cross-application seeks enforcement of its order. The Union was permitted to intervene. We deny enforcement and remand to the Board for further consideration.
 
 Factual Background
 
 5
 Seattle-First National Bank is a national banking association headquartered in Seattle and engaged in commercial banking operations at approximately 170 branches throughout the State of Washington. On November 30, 1970, the Union was certified by the Board as the collective bargaining representative of all Bank employees, excluding professional employees, confidential employees, management trainees, and supervisors and guards. The bargaining unit consists of approximately 4,800 employees. The Union and the Bank entered into two successive bargaining agreements, effective from about August 1, 1971 to July 31, 1974, and from August 1, 1974 to July 31, 1977. On July 6, 1977, while the second agreement was still in effect, the Union and the Bank began meetings directed toward the negotiation of a third agreement. The first six meetings were devoted to the presentation and discussion of the Union's first offer. The Bank presented its first offer, exclusive of cost items, on July 27. On July 29, the parties extended the second agreement indefinitely pending negotiations, subject to termination on ten days notice.
 
 
 6
 The Bank presented succeeding offers at the 11th meeting, on August 10, this one containing its first economic proposals; at the 16th meeting, on August 23; at the 21st meeting, on September 7; at the 27th meeting, on September 27; at the 33rd meeting, on October 13; and on October 20, in the wake of the 36th meeting, held on October 19. The Union presented succeeding offers at the 17th meeting, on August 29; at the 24th meeting, on September 16; and at the 35th meeting, on October 18. Apart from these offers both sides made counterproposals in limited areas from time to time, and accord was reached on some issues, subject to agreement on a total contract. In all, approximately 45 meetings were held without reaching an agreement. A federal mediator participated in the meetings on and after October 13.
 
 
 7
 The Bank's final offer of October 20 was accompanied by a letter summarizing those areas in which the offer improved upon existing proposals. It stated:
 
 
 8
 Our employees have waited long enough. We have met 36 times to date and have yet to reach agreement on major issues. We have bargained in good faith and believe the time has come to conclude these negotiations.
 
 
 9
 As a result, you have until the end of this month to accept the enclosed offer. If you do not accept it by the end of the month, we will assume these negotiations remain at an impasse, and we will implement our offer effective November 1, 1977.
 
 
 10
 Also on October 20, the Bank sent the Union a ten day notice terminating the 1974 agreement.
 
 
 11
 On October 25, the Bank again wrote to the Union, urging that any objections it might have to the final offer be discussed before the November 1, 1977, effective date of the notice of termination. The Union responded by letter on October 28, proposing a meeting on November 2 to discuss and negotiate certain named topics and other items on which agreement had not been reached. The Bank replied the same day:
 
 
 12
 While we are willing to continue meeting with you to discuss any of the open issues, as long as further negotiations appear fruitful, you have the Bank's final offer and the statements contained in the letters to you dated October 20 and 25, 1977, still stand.
 
 
 13
 We look forward to seeing you on November 2nd.
 
 
 14
 The Union did not accept the Bank's offer of October 20, and the Bank implemented the economic portions of its final offer on November 1. The Bank also stopped furnishing monthly employee status reports, as required by the old agreement, and stopped observing the dues check off provision of the old agreement. Despite the Bank's unilateral action and its claim that impasse was reached in late October (incidental to the "final" offer of the 20th) negotiations continued.
 
 Board Proceedings
 
 15
 Charges of unfair labor practices were filed by the Union on September 19 and October 26, 1977. A consolidated complaint was issued by the Board on November 29, 1977, alleging that the Bank had violated § 8(a)(1) and (5) during contract negotiations by acting with an overall lack of good faith.[2] The bad faith of the Bank was allegedly evidenced by: (1) the content of certain of the Bank's contract proposals, (2) the Bank's insistence to impasse on nonmandatory subjects of bargaining, and (3) the Bank's unilateral implementation on November 1 of portions of its last offer.
 
 
 16
 The order of the Administrative Law Judge (ALJ) discussed exhaustively each of the contract proposals urged by the Union as evidence of the Bank's bad faith.[3] It also discussed other alleged indicia of bad faith. The ALJ's findings, however, were limited to the contract proposals, which the judge found provided a basis in themselves for concluding the Bank acted with bad faith during the negotiations. The ALJ also found that the Bank's insistence upon nonmandatory subjects of bargaining up to the time of impasse constituted an unfair labor practice, and that since the Bank had failed to negotiate in good faith no genuine impasse had been reached. The unilateral implementation of portions of its "final offer" accordingly was unlawful under the Act. The ALJ concluded that each of these findings constituted a violation of § 8(a)(1) and (5).
 
 
 17
 The Board affirmed the order of the Administrative Law Judge insofar as it held that the Bank had failed to bargain in good faith and had implemented portions of its last offer before a valid impasse had been reached. It reversed the ALJ's ruling that the Bank had bargained to impasse on nonmandatory subjects of bargaining, concluding that the objectionable proposals had not been negotiated to impasse, but were simply items raised and left unresolved by the negotiations. The Board issued a cease and desist order and ordered the posting of notices.
 
 Scope of Review
 
 18
 The Board's findings of fact must be affirmed if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); K-Mart Corp. v. NLRB, 626 F.2d 704 (9 Cir. 1980); NLRB v. Sacramento Clinical Lab., 623 F.2d 110, 112 (9 Cir. 1980). "If facts are open to conflicting inferences we are not at liberty to draw an inference different from the one drawn by the Board, even though it may seem more plausible and reasonable to us." NLRB v. Millmen, Local 550, 367 F.2d 953, 956 (9 Cir. 1966); Queen Mary Restaurants Corp. v. NLRB, 560 F.2d 403, 407 (9 Cir. 1977). It is required, however, "that substantiality be determined in the light of all that the record relevantly presents." Universal Camera, 340 U.S. at 488, 71 S.Ct. at 464.
 
 Bad Faith Bargaining
 
 19
 Ascertaining compliance with the duty to bargain in good faith generally requires inquiry into an employer's motive or state of mind during the bargaining process. NLRB v. Stanislaus Implement and Hardware Co., 226 F.2d 377, 380 (9 Cir. 1955). "Since it would be extraordinary for a party directly to admit a 'bad faith' intention, his motive must of necessity be ascertained from circumstantial evidence ...." Continental Ins. Co. v. NLRB, 495 F.2d 44, 48 (2 Cir. 1974). Good faith must be determined from an examination of the totality of circumstances. NLRB v. Tomco Communications, Inc., 567 F.2d 871, 883 (9 Cir. 1978); NLRB v. Pacific Grinding Wheel Co., Inc., 572 F.2d 1343, 1347 (9 Cir. 1978). "A state of mind such as good faith is not determined by a consideration of events viewed separately. The picture is created by a consideration of all the facts viewed as an integrated whole." NLRB v. Tomco Communications, Inc., 567 F.2d at 883,[4] quoting NLRB v. Stanislaus Implement and Hardware Co., 226 F.2d at 381.
 
 
 20
 This court has uniformly deferred to the expertise of the Board to make the initial determination whether an employer's conduct demonstrates an unwillingness to bargain in good faith. See, e. g., NLRB v. Dent, 534 F.2d 844, 846 (9 Cir. 1976); Queen Mary Restaurants Corp. v. NLRB, 560 F.2d 403, 407 (9 Cir. 1977). We have recognized that the "Board has been afforded flexibility to determine ... whether ... conduct at the bargaining table evidences a real desire to come into agreement" and that this determination is made by "drawing inferences from the conduct of the parties as a whole." NLRB v. Holmes Tuttle Broadway Ford, Inc., 465 F.2d 717, 719 (9 Cir. 1972), quoting NLRB v. Insurance Agents Union, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 42 L.Ed.2d 454 (1960).
 
 
 21
 On the other hand, Section 8(d) of the National Labor Relations Act expressly provides that the duty to bargain in good faith does not "compel either party to agree to a proposal or require the making of a concession ...." This provision has been interpreted to mean that "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952). While this court has sanctioned the Board's consideration of the content of bargaining proposals as part of its review when making a determination as to the good faith of parties negotiating a contract, NLRB v. Holmes Tuttle Broadway Ford, Inc., supra, 465 F.2d at 719, inferences drawn from those proposals are not alone sufficient to support a finding of a violation of the obligation to bargain in good faith. "In addition, ... the Board must show 'substantial evidence that the company's attitude was inconsistent with its duty to seek an agreement'...." NLRB v. Pacific Grinding Wheel Co., Inc., supra, 572 F.2d at 1348-49, citing NLRB v. MacMillan Ring-Free Oil Co., 394 F.2d 26, 29 (9 Cir.), cert. denied, 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968).[5]
 
 
 22
 We turn now to a consideration of the Board's findings of bad faith in the light of these principles. The findings apparently were based solely upon the contract proposals.[6] The Board made no findings with respect to other evidence which assertedly demonstrated bad faith.[7] Nor has it made any findings with respect to the evidence presented by the Bank in support of its contention that it was bargaining in good faith and that the parties were unable to agree because of the Union's "unreasonable proposals and hard bargaining." In other words, we cannot conclude from the Board's findings that it considered the "totality of the circumstances" which are indicative of mental state.
 
 
 23
 This conclusion is entirely consistent with the holding in the leading case of NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131 (1 Cir.) cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). In that case the employer and the union, as here, engaged in a prolonged period of negotiations without making substantial progress toward reaching agreement. The Board, in reaching its conclusion that the employer had violated his duty to bargain in good faith, examined not only the contract proposals, but all of the circumstances indicative of the employer's mental state which attended the negotiating process. Id. at 134-40. In sum, the Board there examined "the totality of the employer's conduct...." Id. at 134.[8]
 
 
 24
 The determination of whether the Bank was engaged in impermissible "surface bargaining" or permissible "hard bargaining" involves the application of statutory considerations to complex facts susceptible of varying interpretations.[9] This determination can properly be made only upon consideration of the "totality of the circumstances." We remand to the Board for a re-examination of the record to determine whether the record as a whole, including the course of negotiations as well as the contract proposals, supports a finding of bad faith.
 
 
 25
 Unilateral Implementation of Bank's "Final Offer"
 
 
 26
 Those engaged in collective bargaining are normally required to bargain to impasse on all mandatory issues. NLRB v. Tomco Communications, Inc., 567 F.2d at 881. An employer's "unilateral change in conditions of employment under negotiation" is a violation of § 8(a)(5) since it is "a circumvention of the duty to negotiate." NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). If one party fails to bargain in good faith, no valid impasse can be reached. NLRB v. Pacific Grinding Wheel Co., 572 F.2d at 1349.
 
 
 27
 The Board here found that there could be no impasse since the Bank did not bargain in good faith. If, on remand, the Board decides that the Bank did bargain in good faith, it must then address the question of whether an impasse was reached before the unilateral change in wages and working conditions.[10] If not, there would be an independent violation of the duty to bargain in good faith. NLRB v. Pacific Grinding Wheel Co., Inc., 572 F.2d at 1349.
 
 
 28
 Enforcement of the Board's order is denied and the case is remanded to the Board for further consideration consistent with this opinion.
 
 
 
 *
 The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 The order was issued on April 5, 1979 and is reported at 241 N.L.R.B. No. 117
 
 
 [2]
 The applicable portions of Section 8 of the NLRA, as amended, 29 U.S.C. § 158, provide:
 8(a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 (Section 7 guarantees the right of employees "to bargain collectively ..., and to engage in other concerted activities for the purpose of collective bargaining ....")
 (5) To refuse to bargain collectively with the representatives of his employees....
 Section 8(d) defines the duty to bargain collectively as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment ...." This obligation does not, however, "compel either party to agree to a proposal or require the making of a concession...." Id.
 
 
 [3]
 This portion of the ALJ's order sets out in detail each of the objectionable contract provisions as first proposed, the revised version contained in the Bank's October 20 final offer, the changes made after the "final" offer, and the distinctions between the proposals and comparable provisions in the existing contract
 
 
 [4]
 In his decision the ALJ quoted from the Board's decision in Tomco. This court, however, in denying enforcement of the Board's order in that case did not find "the requisite substantial evidence of bad faith in the record as a whole," noting the court's "divergence from the Board is most apparent in the evaluation of bargaining proposals" and rejecting the Board's analysis of the employer's final offer as "terms which no self-respecting union could be expected to accept." Id. at 883
 
 
 [5]
 In Pacific Grinding Wheel, the court recognized that "Board disapproval of proposed terms," "a company's adamant insistence on strong pro-management terms," and "rejection by the employer of terms which were in a previous contract" are not sufficient in themselves to establish bad faith, but are factors which may be considered by the Board with other evidence, and that the "totality of the circumstances may justify a finding of failure to bargain in good faith." Id. at 1348
 
 
 [6]
 The ALJ found, and the Board agreed, that the Bank, among other things, sought to have the Union abdicate its right to strike even over unfair labor practices, to remove most disputes involving employees from any effective grievance and arbitration procedure, to require the exhaustion of contract remedies before employees could exercise any rights they might have under labor or civil rights statutes and simultaneously to set a short statute of limitations during which such complaints might be filed with outside agencies, and to reserve the right in the Bank to change employee-benefit plans without notice to the Union
 
 
 [7]
 While the record contains evidence of other acts of the Bank's representatives before and during negotiations and after impasse from which bad faith could be inferred and both the ALJ and Board were aware of this evidence, the Board's conclusion that the Bank violated its obligation to bargain referred only to the Board's evaluation of the contract proposals made by the Bank. In finding a violation of the obligation to bargain in good faith based exclusively on contract proposals the Board is in effect doing that which it is prohibited from doing sitting in judgment upon the substantive terms of a proposed collective bargaining agreement
 
 
 [8]
 This court has cited NLRB v. Reed & Prince to support its holdings in NLRB v. Holmes Tuttle Broadway Ford, Inc., supra, 465 F.2d at 719; NLRB v. Yutana Barge Lines, Inc., 315 F.2d 524, 528 (9 Cir. 1963); NLRB v. Stanislaus Implement & Hardware Co., supra, 226 F.2d at 381. In NLRB v. Tomco Communications, Inc., supra, 567 F.2d at 883, and NLRB v. MacMillan Ring-Free Oil Co., supra, 394 F.2d at 29, the court, although agreeing with the result of Reed & Prince, expresses reservations concerning some of its language
 
 
 [9]
 Surface bargaining is defined as " 'going through the motions of negotiating,' without any real intent to reach an agreement." K-Mart Corp. v. NLRB, 626 F.2d 704, 706 (9 Cir. 1980). It is often difficult to detect, and is generally provable only through inferences drawn from circumstantial evidence. While it is permissible for a party to engage in "hard bargaining", utilizing its economic power to its advantage to retain as many rights as possible, NLRB v. Tomco Communications, Inc., supra, 567 F.2d at 884, good faith presupposes a desire to reach ultimate agreement, thus management and labor cannot maintain an attitude of "take it or leave it." NLRB v. Ins. Agents International Union, supra, 361 U.S. at 485, 80 S.Ct. at 424. Sophisticated pretense in the form of apparent or surface bargaining is violative of the Act what is required is that both parties "enter into discussions with an open and fair mind, and a sincere purpose to find a basis of agreement...." NLRB v. Holmes Tuttle Broadway Ford, Inc., supra, 465 F.2d at 719. This requirement must be religiously adhered to lest an employer be allowed to utilize his superior economic strength to talk a union to death. See Cox, "The Duty to Bargain in Good Faith", 71 Harv.L.Rev. 1401, 1413 (1958)
 
 
 [10]
 On appeal the Board has raised the question of whether under the facts of this case impasse was indeed reached. It appears from the record that the Bank, after having submitted its "final" offer of October 20, revised that offer in two significant respects on November 10, ten days after implementing its economic proposals: (1) by deleting the language "unfair labor practice strike" from its no strike clause, and (2) by deleting language requiring that the grievance/arbitration procedure be exhausted before employees could exercise rights outside the contract. Then on December 5, the Bank presented a "revised final offer" which also was rejected. A number of bargaining sessions were subsequently held. These factors raise some question as to whether an impasse had in fact been reached