**PITTSBURGH–DES MOINES CORPORATION,**
Petitioner/Cross-Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent/Cross-Petitioner.

Nos. 81–7016, 81–7096.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 14, 1981.

Decided Dec. 14, 1981.

Robert G. Hulteng, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for petitioner/cross-respondent.

W. C. Schumann, Asst. U. S. Atty., Washington, D. C., for respondent/cross-petitioner.

Before MERRILL and NELSON, Circuit Judges, and SWEIGERT,* District Judge.

MERRILL, Circuit Judge:

Pittsburgh-Des Moines Corporation (the Company) petitions for review of the order and decision of the National Labor Rela-

* Honorable William T. Sweigert, Senior United States District Judge, Northern District of California, sitting by designation.

tions Board determining that the Company had failed to bargain in good faith with the collective bargaining representative of certain employees in violation of § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The Board cross-petitions for enforcement of its order. The Board affirmed factual findings of an administrative law judge from which the following facts appear.

For some time the International Brotherhood of Teamsters, Chauffers, Warehousemen & Helpers of America (the Union) has represented the Company's employees in two distinct units under two separate collective bargaining contracts. The latest contracts expired March 31, 1979, at which time the employees in both units went on strike. Prior to that date, the parties had engaged in seven or eight bargaining sessions without reaching an agreement.

On May 17, 1979 a bargaining session was held at which the Union was represented by its business representative Richard Parra and the Company by its district manager Floyd Bedwell. The Company proposed two year renewals of the former contracts without substantial change save in two respects. It proposed a new section on strikes and lockouts, Section XVII, which incorporated a no-strike clause from the former contracts with some elaboration and provided that the Company might fire any employee found to have engaged in a strike in violation of the section. Also the Company proposed to discontinue use of the Union's welfare and pension funds and to provide employee coverage by a qualified plan under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, utilizing "a reliable insurance company" as carrier.

After some bargaining, the parties caucussed separately and thereafter communicated through a mediator. Parra testified that the mediator told him confidentially that there was "no problem" with the language of Section XVII, but that the Company was holding steadfast on medical coverage and pension provisions. Parra testified that he understood this to mean that the Company had withdrawn its proposed Section XVII. (Bedwell testified that no member of his team had ever stated that the Section was being withdrawn or deleted.)

On May 23, Parra got in touch with Ned Ware, a Company executive of a higher level than Bedwell who had not attended the May 17 bargaining session, and without success sought Ware's assistance in preserving use of the Union pension plan. Later that day, Parra telephoned Ware and stated that he would schedule a ratification vote by the employees on the Company proposal and wanted to confirm his understanding that the Company's proposed Section XVII had been dropped. Ware responded that he had no knowledge of the section having been dropped and would have to check it out and report back to Parra. Another conversation between the two occurred May 29 at which time the mechanics of returning employees to work were discussed but without any reference to the strike/lockout provision. Without having received any confirmation from Ware of his understanding with respect to the section, Parra proceeded to conduct a vote of the Union members in ratification of the Company's proposed contract, reporting to the employees that Section XVII had been deleted. The vote was favorable and the employees returned to work.

Parra then arranged with Company officials to prepare drafts of the contracts for execution. The Company prepared drafts incorporating Section XVII, and mailed them to the Union on June 10.

When Parra received the contracts, he immediately telephoned Ware to protest the inclusion of Section XVII. Ware denied any understanding that the section was to be dropped and suggested that the Company might consider further discussion towards a trade-off in contract language. Parra refused to consider any exchange, asserting categorically that an agreement had been reached and that the section had been deleted. Parra then re-authored the contract documents deleting Section XVII and sent these drafts signed by the Union

to the Company. Ware responded that there had been no agreement to delete Section XVII and that the Company declined to execute the re-authored agreement.

On July 12, having heard nothing further from the Union, Bedwell wrote Parra to the following effect:

It is clear that we are in disagreement regarding certain essential contract terms and have not been able to consummate an agreement.

By this letter, we hereby withdraw our last contract proposal and suggest that we get together in the immediate future to continue negotiations to reach an agreement. We will review all matters and have a new proposal for your consideration.

I hope to hear from you as soon as possible regarding the scheduling of a meeting for negotiations.

On July 16 the Union filed an unfair labor practice charge against the Company alleging that since about June 21 the Company had refused to execute a collective bargaining contract upon which the parties had agreed. In due course, after investigation of the charge, the Regional Director advised the Union that no complaint would be issued. On August 22, the Union withdrew the charge. It then resurrected the drafts of agreement sent by the Company on June 10, signed them and forwarded them to the Company. Bedwell responded:

This contract proposal embodies terms of an offer which was unconditionally withdrawn by the Company by a letter dated July 12, 1979. Accordingly, the proposal we received is rejected by the Company. Enclosed is your copy of this rejected proposal which we have not signed.

The Company remains ready and willing to meet with you to bargain in good faith in order to reach an acceptable agreement. I will be preparing a counter proposal from the Company which I will forward to you shortly.

After further exchange of correspondence with each party adhering to its position the Company drew up new proposed contracts and sent them to Parra on September 11. Bedwell stated:

You will note that while certain language changes have been made, the Company's proposals contain the same economic provisions which were included in our previously withdrawn proposal.

He expressed hope for an early resumption of negotiations.

While the economic provisions affecting the employees remained the same, substantial changes were made respecting Union membership, check-off of Union dues, management prerogatives and grievance procedures. There was also an expansion of the substance of Section XVII.

On September 17, Bedwell wrote Parra again urging that a negotiating session be arranged and suggesting September 19 as a date. He stated:

At this meeting, I hope to explain further the Company's current proposals and the circumstances which have contributed to those proposals. The Company will certainly consider any counter proposals the Union may have.

Parra responded by telephone that the Union was not willing to reopen negotiations. Bedwell immediately responded with a mailgram expressing regret over the Union's position and stating:

The Company is anxious to meet with you for the purposes of negotiating the contract. Although we apparently have some differences, I believe that through negotiations, these differences can be resolved. We are ready to move in good faith to reach an agreement. You have not even given us a chance to explain our proposal, or to hear any counter proposals you may have.

The Company remains ready and willing to negotiate with the Union at a time and place of your choice. We want to reach an agreement with you.

This brought a response from the Union attorney, Richard Macey, advising that "negotiations are not in order at this time" because a contract already existed, and that he had advised the Union not to meet with the Company representatives.

On September 25, Bedwell wrote again denying that any agreement had ever been reached on the withdrawn proposal and stating, "I am still awaiting an opportunity to discuss [the new] proposal with you, and to consider any counter proposals the Union may have."

This brought forth a consent from the Union to meet to discuss what "minor variations" from the June 10 proposal "might be acceptable." On October 10, an unsuccessful negotiating session was held, the Union refusing to negotiate save on the basis of the June 10 proposal. On October 23, Bedwell wrote Parra offering to substitute the Union's proposed grievance procedure section for the Company's last proposal and to include a provision respecting the crossing of picket lines which was desired by the Union but had been eliminated from the Company's last proposal. He again urged further negotiations.

Macey responded:

> Your company has consistently ignored that * * * the Union is not and will not enter into any negotiations with your company other than on the basis of a compromise for an existing contract.

On the basis of these facts, the administrative law judge concluded that as to the contentions of General Counsel that Company conduct constituted "surface" or bad faith bargaining "there is utter lack of merit."

The Board concluded otherwise. It stated, "[W]e conclude that by withdrawal of its original proposals tentatively agreed upon and by the substitution without explanation of regressive proposals, Respondent has failed to bargain in good faith * * *."

We find ourselves in agreement with the administrative law judge.

The question is "whether or not the [Company] genuinely desires to reach an agreement." *NLRB v. MacMillan Ring-Free Oil Co.*, 394 F.2d 26, 29 (9th Cir.), *cert. denied*, 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968). Upon this question, the Board must consider the " 'totality of the circumstances' which are indicative of men-

tal state," *Seattle-First National Bank v. NLRB*, 638 F.2d 1221, 1227 (9th Cir. 1981), and it does not suffice to rely solely upon the terms of contract proposals, *id.* In *NLRB v. Pacific Grinding Wheel Co. Inc.*, 572 F.2d 1343, 1348 (9th Cir. 1978), this Court stated:

> This circuit has specifically held that the Board can look at the content of the bargaining proposals as part of its review of all the circumstances. *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972). In addition, however, the Board must show 'substantial evidence that the company's attitude was inconsistent with its duty to seek an agreement' before a finding of failure to bargain is warranted. *NLRB v. MacMillan Ring-Free Oil Co.*, [supra].

We hold that the Board has failed to show substantial evidence to this effect. The record to us demonstrates a desire on the part of the Company to reach agreement and the Union's unreasonable insistence to point of impasse that agreement had already been reached.

The withdrawal of the June 10 proposal followed the Union's flat and unequivocal rejection of that proposal and its insistence, with no support for its position, that Section XVII had been deleted. We cannot accept the proposition, implicit in the Board's conclusion, that in the face of such rejection the Company was somehow committed to all portions of the proposal as to which tentative agreement had been reached; that the Union could hold the Company to what the Union liked while rejecting that which it disapproved. As we stated in *NLRB v. Tomco Communications, Inc.*, 567 F.2d 871, 883 (9th Cir. 1978):

> Absent abuse * * * it is perfectly legitimate for a party to retract a proposal before the other side has accepted it. It may do so because the offer was germane only to the context in which it was made * * * or because it has further determined the relative bargaining strengths of the opposed sides. The law does not require that each offer and indication of possible acceptance be included in the fi-

nal contract before a legal impasse is reached.

The proposal, as a package, was the result of hard bargaining—bargaining hard enough to have included a strike. We must assume that the proposal, advanced in the course of the strike, was the result of compromise and that concessions may well have been tendered in some areas with the hope of securing agreement on those provisions which the Union chose to reject. " 'To bargain collectively' does not impose an inexorable ratchet, whereby a party is bound by all it has ever said." *Id.*

We conclude that following rejection of the proposal by the Union, its withdrawal by the Company was fully justified and that the proposal then ceased to exist and could no longer form the basis for an agreement.

As to the submission of the September 11 proposal, the Company at all times made it abundantly clear that all changes from the June 10 proposal were negotiable and that counter proposals would be welcomed. The Company justifies its proposal of those changes on the ground that its bargaining position had been strengthened since June 10: the Union had failed in its effort to secure from the Board an unfair labor practice complaint; its strike, in the course of which the June 10 proposal had been advanced, had been terminated.[1] The Company contends that its improved position, in the context of hard bargaining, warranted its decision to negotiate from scratch.

In our judgment, in the light of the Union's flat rejection of the June 10 proposal and the Company's reiterated willingness to negotiate the September 11 proposal, this effort on the part of the Company to secure renegotiation of the contract in the climate of its improved bargaining position cannot be said to be so unreasonable as to give rise to an inference that the Company intended that no agreement be reached, with the result that the Union was released from any further obligation to bargain. *See NLRB v. Randle-Eastern Ambulance Service, Inc.*, 584 F.2d 720 (5th Cir. 1978).

As to the failure of the Company to explain its actions, it is abundantly clear from the record that the Company repeatedly sought the opportunity to explain and that its requests were rejected out of hand. If there was a breakdown in negotiations, it occurred in the face of urgings by the Company that negotiations continue. If there was any refusal to bargain, it was on the part of the Union.

The petition of Pittsburgh-Des Moines Corporation is granted. The Board's prayer for enforcement of its order is denied.

---

1. While the Union asserts that the strike was ended through misunderstanding on the part of Parra, there is nothing to suggest that the Company contributed to such misunderstanding. The only basis asserted by Parra for his conclusion that Section XVII was to be deleted was a confidential aside from the mediator which was never confirmed by the Company and which would seem to have been intended by the mediator only to aid the Union in further negotiation and not to represent that agreement had already been reached. Parra's reckless report to the Union members that the section had been deleted cannot be held against the Company.