SPARKS NUGGET, INC., d/b/a John Ascuaga's Nugget, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Hotel Employees and Restaurant Employees Local 86, Hotel Employees and Restaurant Employees International Union, AFL–CIO (Union), Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Hotel Employees and Restaurant Employees Local 86, Hotel Employees and Restaurant Employees International Union, AFL–CIO (Union), Intervenor,

v.

SPARKS NUGGET, INC., d/b/a John Ascuaga's Nugget, Respondent,

Nos. 90–70316, 90–70370.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 1991.

Submission Deferred Nov. 5, 1991.

Resubmitted May 14, 1992.

Decided July 8, 1992.

Robert G. Hulteng, Elizabeth A. Franklin, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., Richard L. Davenport, Davenport & Perry, Sparks, Nev., for petitioner.

Joseph A. Oertel, N.L.R.B., Washington, D.C., for respondent.

Barry S. Jellison, Andrew J. Kahn, and Michael T. Anderson, Davis, Cowell & Bowe, San Francisco, Cal., for intervenor.

Before: TANG and TROTT, Circuit Judges, and BREWSTER,* District Judge.

TROTT, Circuit Judge:

We review, in this case, a decision of the National Labor Relations Board ("NLRB" or "the Board") holding that Sparks Nugget, a hotel/casino, violated sections of the National Labor Relations Act ("NLRA" or "the Act") by: (1) bargaining with the Hotel, Motel, Restaurant and Employees and Bartender's Union Local 80 ("the union") in bad faith; and (2) forcing union agents to halt picketing, handbilling, and recording of bus license numbers in the parking lot of the hotel/casino. Sparks Nugget seeks review of the NLRB decision; the NLRB seeks enforcement. Enforcement is granted in part and denied in part.

## I

### A

A previous decision and order of the NLRB, which was enforced by the Ninth Circuit, see *NLRB v. Silver Spur Casino*, 623 F.2d 571 (9th Cir.1980), *cert. denied*, 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981), held that beginning in December, 1974, Sparks Nugget violated various sections of the NLRA by: (1) refusing to bargain, *id.* at 576–81; (2) promulgating non-solicitation rules that prohibited employees from soliciting on company premises after their shifts had been completed, *id.* at 581–83; (3) unilaterally implementing a new grievance procedure and insurance program, *id.* at 583–84; (4) refusing to furnish the union with a requested copy of the new insurance program, *id.* at 584; (5) unlawfully interrogating an employee regarding her union activity, *id.* at 584–85; and (6) reprimanding an employee because he was suspected of engaging in union activities that the employer had sought to deter him from pursuing, *id.* at 585.

The Board's order, as enforced, required Sparks Nugget to "[r]ecognize and, upon request, bargain collectively with" the union. *Sparks Nugget*, 230 N.L.R.B. 275, 288 (1977). The instant case arises out of the failure of the earlier order to resolve the dispute between Sparks Nugget and the union.

When the union asked to resume bargaining, the union alleges that Sparks Nugget only agreed to short, intermittent bargaining sessions. On June 2, 1981, the union's principal negotiator, Vincent Sirabella, requested that negotiations commence between the union and Sparks Nugget. Sirabella asked that they meet regularly and often. Clinton Knoll, the principal negotiator for Sparks Nugget, responded that they could not meet for as long a time nor as frequently as the union wished

* The Honorable Rudi M. Brewster, United States District Judge, Southern District of California, sitting by designation.

because the managers were "businessmen, and they have to take care of business." Sirabella offered to adjust the union's schedule to accommodate the demands of Sparks Nugget, but the offer was refused.

On October 21, 1981, the union sent a contract proposal to Sparks Nugget that was identical in all respects—except wages—to its then-current contract with another establishment, Circus–Circus. The first negotiating session between Sparks Nugget and the union took place on October 27, 1981, and Knoll, Spark Nugget's negotiator, stated that the demand for the Circus–Circus contract would make things difficult. Sparks Nugget instead wanted to revive the 1972–1975 contract while retaining the then-current 1981 wages. Knoll also wanted a merit system for wage increases that gave Sparks Nugget unilateral power to decide when and which employees received increases, and offered no guaranteed wage increases at all. Knoll further insisted he would not agree to a hiring hall.

Sirabella stated that the union did not require adopting the Circus–Circus contract verbatim. Sirabella maintained that the proposal was not "etched in stone." He emphasized that the union had not requested a hiring hall. He also withdrew a request for indemnification and agreed to continue a profit-sharing plan in lieu of a pension plan.

At a one-and-one-half-hour meeting on November 10, 1981, Sirabella proposed various wage increases, based on "(1) the effects of inflation; (2) a comparative wage analysis with unionized employers in the industry in the Nevada–California area; and (3) equal pay for equal work, by the end of the first 3–year contract." *Sparks Nugget*, 298 N.L.R.B. No. 69, 6 (1990). Sparks Nugget rejected the proposal *in toto* without considering any of the elements separately, and continued to make, basically, the same demands as those issued at the prior meeting. At yet another meeting on December 1, 1981, Sparks Nugget continued to insist upon the 1972–1975 contract updated to current wage levels.

Sirabella critiqued this proposal point by point.

On December 17, 1981, during a forty-five minute session, Knoll disparaged the union's wage proposals. Sirabella replied that the proposals were only the "opening gambit" and not the "bottom line." Knoll responded that the 1972–1975 terms were "going to be it." Knoll also repeated he would never agree to a hiring hall. Again, he was assured the union was not seeking one.

On January 8, 1982, Knoll stated he would agree to non-binding federal mediation. The mediation session occurred on January 14, 1982, and no progress was made. On January 28, 1982, the second and last federal mediation session was held, and again no progress was made. At this meeting, Knoll continued to insist that Sparks Nugget would "make the decision [as to seniority] solely and independently from any involvement with the Union." As for wages, Sparks Nugget would determine the increases and the union "would have nothing to say about it." Suffice it to say, the collective bargaining process failed.

**B**

The second aspect of this case concerns picketing. On June 17, 1982, about four-and-one-half months after the last bargaining session, nonemployee union representatives picketed and distributed handbills on both the street side and the private-driveway side of the hotel/casino. Twenty minutes after the handbilling and picketing started, local police and Sparks Nugget security guards asked the protesters to leave Sparks Nugget's property. They moved into the public street where it intersected with the driveway. On July 3, 1982, company guards expelled from the Sparks Nugget parking lot a nonemployee union supporter who was recording the license numbers of tour buses in that lot. She was told the lot was private property.

**C**

Based on the failure of the collective bargaining process, charges were filed

against Sparks Nugget on June 10, 1982 and June 29, 1982, alleging violations of section 8(a)(5) and (1) of the National Labor Relations Act.[1] A consolidated complaint charged Sparks Nugget with (1) unlawfully refusing to bargain in good faith with the union, and (2) improperly barring the union from picketing and handbilling on its premises.

### D

Both the ALJ and the NLRB found Sparks Nugget violated section 8(a)(5) and (1) of the NLRA by refusing to bargain in good faith with the union. The Board found that Sparks Nugget adamantly refused "to make any modification in its only contract proposal, in the face of the Union's willingness to modify its proposals." *Id.* at 12. Moreover, the Board found Sparks Nugget was unwilling to explain or justify its proposals clearly, and that the proposals indicated a lack of serious intent to reach agreement. *Id.*

The Board also found Sparks Nugget violated section 8(a)(1) of the Act by prohibiting representatives of the union from picketing, handbilling, and recording the license numbers of tour buses in the Sparks Nugget parking lot.

### II

■ The scope of review in this case is narrow:

> [T]he Board has been afforded flexibility to determine ... whether a party's conduct at the bargaining table evidences a real desire to come into agreement. Findings as to the good faith of parties involved in collective bargaining is a matter for the Board's expertise and will not be upset unless unsupported by substantial evidence.

*Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 407 (9th Cir.1977) (quotations omitted) (omissions in original). The Board's conclusions shall be afforded deference if they are based on a reasonable

construction of the Act. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266–67, 95 S.Ct. 959, 968–69, 43 L.Ed.2d 171 (1975). "We must uphold a Board rule 'as long as it is rational and consistent with the Act, even if we would have formulated a different rule had we sat on the Board.'" *NVE Constructors, Inc. v. NLRB*, 934 F.2d 1084, 1086 (9th Cir.1991) (quoting *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990)). Deference extends to the Board's factual determinations that are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951).

### III

### A

■ The Board's decision should be based on the totality of the parties' conduct. *Pittsburgh–Des Moines Corp. v. NLRB*, 663 F.2d 956, 959 (9th Cir.1981) (citations omitted). Because our role is to determine whether the Board had substantial evidence with which to find Sparks Nugget had violated the Act, a brief review of the Board's findings follows. We will then address those areas where Sparks Nugget claims the Board lacked substantial evidence or acted clearly erroneously.

■ The Board gave the following reasons for ruling that given the totality of the bargaining context, Sparks Nugget had violated the Act:

(1) Sparks Nugget failed to compromise in its negotiations. *See Sparks Nugget*, 298 N.L.R.B. No. 69, at 12. We hold the Board did not abuse its discretion in this finding, because "[a]lthough Section 8(d) does not require the making of a concession, the definition of 'good faith,' as developed by the Board and the courts, includes a willingness to compromise as an important factor." *The Developing Labor Law, Fifth Supplement 1982–1988* 306 (Timothy

---

**1.** "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; ... (5) to refuse to bargain collectively with the representatives of his employees...." 29 U.S.C. § 158(a)(1), (5) (1988).

O'Reilly, et al. eds., 2d ed. 1989). The record provides substantial evidence for this finding. Moreover, substantial evidence indicates the union was willing to compromise. The union actually did compromise in allowing Sparks Nugget to administer a profit-sharing plan in lieu of a pension plan.

(2) Sparks Nugget's proposal included total control of wages, seniority, and work rules. Sparks Nugget refused "to provide any justification for placing subjects of such importance to the employees beyond the influence of the employees' collective-bargaining representative." *Sparks Nugget*, 298 N.L.R.B. No. 69, at 12.

(3) The Board found that Sparks Nugget failed to meet frequently or at length with the union. Moreover, management's justification that it was comprised of business-men who "have to take care of their business," *id.* at 13, implied, as the Board stated, that "bargaining was not part of its business, but rather something to be fitted in at odd moments, without regard to whether significant progress toward reaching agreement could be made by proceeding in this manner," *id.*

The failure to compromise, the proposal of a contract that gave management total control of wages, seniority, and work rules, and the unwillingness to schedule long or frequent meetings, support the inference of bad faith and surface bargaining. "Surface bargaining is defined as 'going through the motions of negotiating' without any real intent to reach an agreement." *K–Mart Corp. v. NLRB*, 626 F.2d 704, 706 (9th Cir.1980) (citation omitted); *see also NLRB v. Maywood DoNut Co.*, 659 F.2d 108, 109 (9th Cir.1981).

We hold there was substantial evidence for the Board's findings. However, Sparks Nugget argues the Board made errors of law. We now address its arguments.

*(1) Did the NLRB err by relying on actions that occurred outside the six-month statute of limitations?*

The union filed the refusal-to-bargain grievance on June 10, 1982. The negotiations lasted from October 27, 1981, to January 28, 1982. Sparks Nugget claims that under section 10(b) of the Act,[2] events prior to December 10, 1981, cannot be used to substantiate a finding of bad faith bargaining. Sparks Nugget claims that "although the events occurring within the six months antedating the filing of the charge here need not in and of themselves constitute an unfair labor practice, the evidence of violations falling within that time frame must be substantial."

This claim is without merit. The Board was careful to note that the original ALJ "considered the Respondent's conduct in bargaining prior to December 10, 1981, *insofar as it shed light on the Respondent's conduct thereafter.*" *Sparks Nugget*, 298 N.L.R.B. No. 69, at 3 n. 5 (emphasis added).

In *Queen Mary Restaurants*, we held that "[e]vents occurring outside the 'six-month statute of limitations' of § 10(b) of the Act may be considered as evidence shedding light on the conduct within the six-month period which is being challenged." 560 F.2d at 407 n. 2 (citations omitted); *see also Local Lodge No. 424, Int'l Ass'n of Machinists v. NLRB*, 362 U.S. 411, 416, 80 S.Ct. 822, 826–27, 4 L.Ed.2d 832 (1960) ("It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge.... [E]arlier events may be utilized to shed light on the true character of matters occurring within the limitations period"). The Board had substantial evidence with which to find unfair labor practices occurred during the six-month period within the statute of limitations.

*(2) Did the NLRB err by relying on the substance of Sparks Nugget's proposals?*

Sparks Nugget claims the Board's decision rested in part on the *substantive*

**2.** 29 U.S.C. § 160(b) (1988) reads in pertinent part: "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made."

terms of the parties' proposals. Sparks Nugget cites *NLRB v. American Nat'l Ins. Co.* to support the proposition that "the Board should not pass upon the desirability of the substantive terms of labor agreements." 343 U.S. 395, 408–09, 72 S.Ct. 824, 832, 96 L.Ed. 1027 (1952).

In *NLRB v. Mar–Len Cabinets, Inc.*, 659 F.2d 995 (9th Cir.1981), we held that looking to the substance of an agreement is permissible when it "supports an inference of intent to frustrate agreement where ... the entire spectrum of proposals put forward by a party is so consistently and predictably unpalatable to the other party that the proposer should know agreement is impossible." *Id.* at 999. Sparks Nugget attempts to distinguish *Mar–Len* by claiming the Board found bad faith bargaining based merely on Sparks Nugget's contract proposal, not on conduct inferred from the proposal. However, a review of the Board's report indicates it used the substantive facts of the proposals only to determine if Sparks Nugget was trying to thwart union representation of its workers:

> The nature of some of the Respondent's proposals also evinces a lack of serious intent to reach agreement. The Respondent's unwavering demand for total control of wages, seniority, and work rules—which amounted to excluding these from the bargaining process both at the contract-negotiation table and throughout the term of the contract proposed by the Respondent—was all the more likely to frustrate agreement because of the Respondent's refusal to provide any justification for placing subjects of such importance to the employees beyond the influence of the employees' collective-bargaining representative.

*Sparks Nugget*, 298 N.L.R.B. No. 69, at 12. When the proposal's substance obviously is unpalatable to the other side, it can be viewed as evidence to establish bad faith bargaining. *See NLRB v. F. Strauss & Sons, Inc.*, 536 F.2d 60, 64 (5th Cir.1976) ("In evaluating the parties' good faith, the Board is not precluded from examining the substantive proposals put forth"); *Reichhold Chemicals, Inc.*, 288 N.L.R.B. 69, 70 (1988) ("the content of bargaining proposals will, in certain circumstances, be evidence of an intent to frustrate the collective-bargaining process").

Therefore, Spark Nugget's argument that the Board's reliance on the proposal's substance was impermissible is not persuasive.

*(3) Did the NLRB err by failing to consider bad faith conduct by the union?*

According to Sparks Nugget, the union falsely charged that Sparks Nugget's proposal did not address the question of gratuities. In fact, the proposal did address the gratuities issue. Sparks Nugget claims this circumstance is akin to its own rejection of the never-proposed hiring hall, which the Board considered a sign of bad faith. Further, Sparks Nugget argues, Sirabella stated the union would never agree to a merit pay system or to a contract without a seniority clause. Sparks Nugget claims this means the union was also intractable with regard to its initial proposal.

Here, we must defer to the Board. Evidence shows the union was willing to compromise throughout the negotiations. As to Sparks Nugget's analogy between the gratuities claim and the hiring hall claim, while the two incidents may be similar, bad faith is determined by a total review of the record, *see Pittsburgh–Des Moines*, 663 F.2d at 959, not by isolated incidents. In this case, the Board's findings were not clearly erroneous.

Thus, we uphold the Board's findings. Sparks Nugget made only one proposal, and that proposal would have resulted in total unreviewability of wages with respect to seniority. Sparks Nugget sought to avoid any lengthy or frequent negotiation meetings. Given the deferential nature of this review, we find there is substantial evidence to uphold the Board's decision with respect to violations of sections 8(a)(5) and (1) of the Act.

### B

On June 17, 1982, nonemployee union agents began to picket and handbill on the public street in front of Sparks Nugget's entrance and on the private driveway

around the back where many customers enter the hotel. The hotel evicted the protestors from its property and forced them to picket only on the public street. The Board found that Sparks Nugget violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by prohibiting the nonemployee union representatives from handbilling and picketing in the back parking lot of Sparks Nugget. Section 8(a)(1) states that it constitutes unfair labor practices for an employer "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in [§ 7]." 29 U.S.C. § 158(a)(1). Section 7 of the NLRA states that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations." 29 U.S.C. § 157 (1988).

Since this case was argued, the Supreme Court has decided *Lechmere, Inc. v. NLRB*, —— U.S. ——, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992), which controls the issue contested here. In *Lechmere*, nonemployee union organizers placed handbills on cars parked in the employees' parking lot of Lechmere, a department store, and Lechmere Plaza, a connected mall of 13 stores. *Id.* 112 S.Ct. at 844. The organizers were asked to leave, which they did. However, they renewed their efforts on several other occasions. *Id.* The union filed an unfair labor practices charge with the NLRB.

■ The Supreme Court held that "by its plain terms ... the NLRA confers rights only on *employees*, not on unions or their nonemployee organizers." *Id.* 112 S.Ct. at 845. Following *NLRB v. Babcock & Wilcox*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), Justice Thomas stated that "an employer need not accommodate nonemployee organizers unless the employees are otherwise inaccessible." *Lechmere*, 112 S.Ct. at 846. The type of balancing test used by the Board in the instant case can

no longer be used "[i]n cases involving *nonemployee* activities." *Id.* at 848.[3]

The only analysis we are allowed to make, under *Lechmere*, is to determine whether "nonemployee union organizers have reasonable access to employees outside an employer's property." *Id.* However, this "exception to *Babcock's* rule is a narrow one." *Id.* 112 S.Ct. at 849. It only applies where "the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them." *Id.* at 849 (quoting *Babcock*, 351 U.S. at 113, 76 S.Ct. at 865) (emphasis omitted).

The Board in its decision here found that with regard to possible alternative means of communication, the majority of the picketers' intended audience arrived in tour buses and proceeded directly into the hotel via the parking lot rear entrance. *Sparks Nugget*, 298 N.L.R.B. No. 69, at 26. Even those in private cars often walked through the rear entrance. Because the distance between the street and the rear entrance was sizable, the Board held that alternative means were not feasible. *Id.* at 27. The passengers in the buses, even if they could see the picket lines, would not be able to receive the handbills if they proceeded directly to the rear entrance. *Id.* The Board's finding, however, was based on balancing the union's rights and Spark Nugget's private property rights, and then weighing in the availability of alternative communication.

After *Lechmere*, in cases involving nonemployee activities, the Board may not "engage in the same balancing." *Lechmere*, 112 S.Ct. at 848. Given the narrow construction of the exception to the employer's private property rights articulated in *Lechmere*, we must hold that the exception applies when the nonemployee picketers are

---

**3.** The Board in the instant case used the criteria of *Jean Country*, 291 N.L.R.B. 11 (1988), to balance section 7 rights against Sparks Nugget's property rights. In *Jean Country*, the NLRB held that the union's right under section 7 of the Act, to "engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157, must be directly weighed against the employer's property right. The notion of the availability of alternative means of communication is to be "significant in this balancing." *Jean Country*, 291 N.L.R.B. at 14. In *Lechmere*, the Supreme Court held that this kind of balancing is no longer appropriate.

trying to reach *employees,* not *customers.* Here, the pickets and handbills were aimed at the general public, not the employees. Therefore, the inaccessibility exception to the rule that an employer need not accommodate nonemployee organizers, does not apply.

Moreover, even if the exception were to apply, the intended audience—the general public—could be reached in other ways. The hotel is not the equivalent of an isolated mining camp—the picketers could stand at the front entrance and the perimeter of the property, they could communicate through advertisements or by sending mailings to tour companies, or they could communicate through billboarding. As in *Lechmere,* we must hold that because the targets of the union protest "do not reside on [the employer's] property, they are presumptively not beyond the reach of the union's message." *Id.* 112 S.Ct. at 849 (quotation omitted).

▪ The union argues, in a supplementary brief, that we should find the property rights described in *Lechmere* do not apply when the employer is violating other labor laws—such as here when the employer engages in unfair labor practices. However, *Lechmere* envisions no such exception. The Supreme Court has created a bright line rule: "[A]n employer cannot be compelled to allow distribution of union literature by nonemployee organizers on his property," *id.* 112 S.Ct. at 847—with only the one narrow exception to accommodate workers who are truly inaccessible.

▪ Since *Lechmere,* the NLRB has noted that the Supreme Court in *Babcock* explicitly held that " 'an employer may validly post his property ... if [it] does not discriminate against the union by allowing other distribution.'" *Davis Supermarkets, Inc.,* 306 N.L.R.B. No. 86, 3 (1992) (quoting *Babcock,* 351 U.S. at 112, 76 S.Ct. at 684). The NLRB in *Davis Supermarkets* held that an employer will violate the Act if there is "disparate treatment of protected union activity." *Id.* The union charges that Sparks Nugget paid employees to distribute anti-union handbills, and this constituted discriminatory distribution.

We disagree. The holding in *Lechmere* is consistent with the employer's right to distribute literature on his own property, while keeping others out. This is not discriminatory.

### C

Finally, the Board made findings that Sparks Nugget appears not to be contesting. The Board found that Sparks Nugget violated section 8(a)(1) of the Act (1) when, with no business justification, it photographed employees at a union press conference, *Sparks Nugget,* 298 N.L.R.B. No. 69, at 2 n. 3; (2) when it solicited employees to engage in anti-union picketing "on-the-clock" while being paid by the Company, *id.* at 22 n. 28; and (3) by threatening it would layoff 20% of the workforce because it could not afford the union's bargaining demands, *id.* at 30. Also the Board found that Sparks Nugget violated section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)) when it bypassed the union and dealt directly with the employees regarding the break-relief system. *Id.* at 32. The Board issued a cease and desist order requiring Sparks Nugget to stop these activities and to destroy all photographs and negatives of the union press conference. *Id.* at 32.

Because Sparks Nugget did not contest these findings, it waives its defense. *NLRB v. West Coast Liquidators, Inc.,* 725 F.2d 532, 536 n. 5 (9th Cir.1984); *NLRB v. Sav–On Drugs,* 709 F.2d 536, 542 (9th Cir.1983). We enforce the Board's order regarding these findings.

### IV

Therefore, we ENFORCE the orders related to the NLRB's finding that Sparks Nugget violated section 8(a)(5) and (1) of the Act by refusing to bargain with the union in good faith, and we ENFORCE the orders related to the uncontested findings of the NLRB. We DENY ENFORCEMENT of the Board's order with respect to its holding that Sparks Nugget violated section 8(a)(1) of the Act by prohibiting representatives of the union from entering the hotel for the purpose of picketing,

handbilling, and obtaining the license numbers of tour buses as a protest of Sparks Nugget's refusal to bargain.

ENFORCEMENT is GRANTED in part and DENIED in part.